STATE v. S. P. and J. W. BRITTAIN.

*Homicide—Son fighting in defence of his father—Tales-juror—Misconduct of Jury, impeachment of verdict of.*

1. Where a prisoner makes an assault upon A, and is re-assaulted so fiercely that the prisoner cannot retreat without danger of his life, and the prisoner kills A; *Held,* that the killing cannot be justified upon the ground

31

of self-defence. The first assailant does the first wrong and brings upon himself the necessity of slaying, and is therefore not entitled to a favorable interpretation of the law.

2. The killing being established, the offence is murder; and it is incumbent upon the prisoner to show circumstances of mitigation or excuse to the satisfaction of the jury, unless the same arise out of the evidence adduced on the part of the prosecution.

3. And if such proof puts the offence of murder out of the way, the law of this state is that it is still incumbent upon the prisoner to show, in like manner, the circumstances of justification; and if he fails to do this, the offence is manslaughter.

4. If two men fight upon sudden quarrel and equal terms, the one upon provocation and the other upon a predetermined intention to kill, the fact that the latter would be guilty of murder if he slew his adversary cannot excuse the former if he should be the slayer.

5. Though a son may fight in the necessary defence of his father, yet the act of the son must receive the same construction as the act of the father would have received.

6. A juror of the original panel is not subject to be challenged upon the ground that he had served upon a jury in the same court within two years: only *tales-jurors* who have thus served are disqualified by the statute. THE CODE, §1733, *proviso*.

7. A juror cannot be examined as a witness to impeach the verdict of the jury of which he was a member.

8. Where the circumstances are such as merely put a suspicion on the verdict by showing, not that there *was*, but that there might have been, undue influence brought to bear upon the jury because of the opportunity for it; *Held*, that the granting a new trial is discretionary with the presiding judge.

(*State* v. *Ta-cha-na-tah*, 64 N. C., 614; *State* v. *Frank*, 5 Jones, 384; *State* v. *Willis*, 63 N. C., 26; *State* v. *Ellick*, 2 Winst., 400; *State* v. *Johnson*, 3 Jones, 266; *State* v. *Haywood*, Phil., 376; *State* v. *Smith*, 77 N. C., 488; *State* v. *Vann*, 82 N. C., 631; *State* v. *Johnson*, 75 N. C., 174; *State* v. *Cockman*, 2 Winst., 95; *State* v. *Smallwood*, 78 N. C., 560; *State* v. *Tilghman*, 11 Ired., 513, cited and approved).

INDICTMENT for murder tried at Fall Term, 1883, of HENDERSON Superior Court, before *Gudger, J.*

The prisoners are charged with the killing of Samuel P. Cunningham, and upon the trial they made several exceptions, based upon facts which are substantially as follows:

One Shipman, a juror of the original panel, when called was challenged by the prisoners on the ground that he had served as a juror in that court within two years of that term of the court, but the challenge was disallowed and the prisoners excepted.

A difficulty occurred between the prisoners, Samuel P. Brittain and John W. Brittain, and one J. H. Fanning, in reference to the lease of a store in the town of Hendersonville, known as the "Few store."

Dr. Egerton, a witness for the state, testified that on the day of the difficulty, the deceased and himself were standing at the rear end of the store of the deceased, and, upon hearing rapid firing down the street, in the direction of the "Ewart building," the deceased stepped out on the street in front of witness, and jumping back, said, "I am shot.". The ball entered the back of his right hand, and lodged against the skin on the inside of the hand. Dr. Few and the witness extracted the ball. The witness saw the deceased at his store the day after the shooting; his hand was very much swollen, and he complained that it gave him great pain, and he afterwards died.

Dr. Few, who was examined without objection as an expert, testified that he had assisted in extracting the ball from the hand of the deceased. On the Sunday after he received the wound, he became his physician and attended him till his death, and gave as his opinion that he died of blood poison, produced by the wound. In answer to questions by prisoners, the witness stated that he had the house rented when the difficulty occurred, and had sublet the house to the prisoner, S. P. Brittain, from the 1st day of January, 1883. He did not lease to Fanning. He was shown the lease he had made to S. P. Brittain, and identified it, and stated that Brittain had paid the rent due for the first month.

Dr. Fletcher was examined as an expert, and stated that he had had a consultation with Dr. Few on the condition of the deceased, and concurred with him in the opinion that deceased

died of blood poison, and that his death was caused by the wound producing blood poison.

J. H. Fanning was next introduced, and testified that on the day in question he had been bird hunting, and on his return left his gun in Whitted's drug store and went to the billiard saloon. He found that his meal and corn had been moved out of the Few store, and, finding the door of the same unlocked, he went in, moved his meal and corn back into it where it had been. He then nailed up the door and windows and went out by a window. He met S. P. Brittain, who asked him what he was doing? and Fanning replied he had been putting his meal and corn back in the store, and was nailing up the door and windows, and did not want him or any one else to put them out again. He and Brittain had rented the store together, and he was to be a secret partner, and they were going into the whiskey business. When he told Brittain not to carry out the corn and meal, Brittain said "by G—d, he would go in in less than three minutes." He walked off rapidly towards Main street, and witness did the same. He saw the prisoners, S. P. and J. W. Brittain, coming across the street to the court-house and back to the "Ewart building," and both the prisoners went into the drug store and stayed a few minutes. J. W. Brittain pulled off his overcoat, pulled a pistol out of his overcoat pocket and put it in his right coat pocket. They then walked out and towards the Few store. The witness picked up his gun and started to his billiard saloon, by way of the Few store, where his meal and corn were, and, seeing S. P. Brittain knocking at the door, said, "don't go in." S. P. Brittain said "by G—d, I am going in," and bursted the door open with his shoulder and went inside. J. W. Brittain followed, and witness also went in, saying, "I have as much right to go in as you; I own one-half of the store; I am in possession; my meal and corn are in here; I have a right to protect it." S. P. Brittain drew a piece of scantling and J. W. Brittain drew a pistol. S. P. Brittain said "G—d d—n you, get out of here or I will break your head." He stepped

out on the sidewalk two or three steps, S. P. Brittain followed with the scantling and J. W. Brittain came to the door. They talked about the room, and witness said he had as much right to the room as before. S. P. Brittain struck him on the head with the scantling, saying " d—n you, you will not go in there." The witness remembered nothing more, except that when he was struck the jar caused his gun to fire. He was then carried to Mr. Tom's store, where his wounds were dressed.

On cross-examination, the witness stated that S. P. Brittain was to do the renting and they were to be partners; he paid half of the first month's rent, and used the room in the store to sell his meal and corn, with the consent of S. P. Brittain. Witness had two guns, and was in the habit of putting his gun in Whitted's drug store. He did not tell Maxwell and Justice he was going to use his gun. He and S. P. Brittain had dissolved their partnership that morning, before he went hunting, except as to this room in dispute. They had been partners in a whiskey shop called "Hole-in-the-wall." Brittain owed him, and he told him to pay it over to Few for the next rent due.

He further stated that when S. P. Brittain knocked the store door down, he was standing six or seven feet from the door, and said "boys, don't knock the door down." "I stepped in the store after the prisoners, with my gun in my hand, with the muzzle down to the ground and the breech under my arm." When S. P. Brittain told him to go out, he did so, going backwards to the street, and he then turned and walked up the street ten or twelve feet. S. P. Brittain followed and witness turned toward him, when Brittain struck and the gun went off. He did not know that the gun was cocked, nor did he tell J. B. Arledge, or any one else, that morning, that he wanted a pistol, as he was going to kick up " a little hell " that day ; did not tell S. P. Brittain that he would kill the first person who went into the store. When he got his gun from the drug store he started to his billiard room, intending to go through the Few store, but he did not intend a difficulty. He carried one key

and S. P. Brittain another.  He had left his key on his key-ring at his trunk in the billiard room, and in his absence that morning some one had taken it off.  He told Maxwell in the billiard room there might be some trouble, but he did not desire a difficulty.

John Maxwell was next called by the state.  His testimony was the same as that of the witness Fanning to the point when the prisoners came out of the drug store.  S. P. Brittain then had a hatchet, but he never saw the hatchet afterwards.  J. W. Brittain had a pistol in his pocket with his hand on the handle. They went up to the store-door, and Fanning came out of the drug store, and told them not to go in.  S. P. Brittain kicked open the door, and then entered, followed by Fanning.  S. P. Brittain said to Fanning, "G—d d—n you, go out," and as Fanning came out, S. P. Brittain said "shoot, d—n you, shoot." Fanning got out about midway the sidewalk with his gun in his hand, with the muzzle down toward his feet, about midway between himself and S. P. Brittain, and it went off and took effect in the ground.  S. P. Brittain struck with the scantling ; the witness thought "the gun fired a little first, but near about the same time with the blow."  When S. P. Brittain came out he had the scantling drawn.  J. W. Brittain came to the door as S. P. Brittain struck the second blow; the gun fired again and took effect in the wall of the house, and J. W. Brittain fired. This was all about the same time.  S. P. Brittain struck again and the gun was thrown up and broken by the blow.  J. W. Brittain kept shooting.  Fanning threw up his hand and ran up the street, and J. W. Brittain, who had come out on the side-walk, shot a time or two as he went up the street; all were on the sidewalk and the firing was towards Cunningham's (the deceased store.  Fanning fired two shots, the one in the ground and the other rather down the street not in the direction of Cunningham's store.  Before the difficulty, Fanning said if he had to fight he would do it, and, pointing to his gun, said, "that is all the friend I need."

On cross-examination, the witness stated he did not hear S. P. Brittain say anything up to the time he went in the store. When Fanning came out of the drug store his gun looked as if it was cocked. J. W. Brittain shot after Fanning had turned and run up the street. Fanning said they had had a fuss that morning and he had put S. P. Brittain out, and their business was broken up. While going to put his meal and corn back, Fanning said he expected a row and would not be run over.

W. D. Justice, a witness for the state: The testimony of this witness was, in the main, of the same import as that of the witness Maxwell. He stated that when Fanning came out of the store he had a shot gun in his hand, and S. P. Brittain a piece of scantling, and he said "shoot, d—n you, shoot;" the gun was discharged, taking effect in the ground, and S. P. Brittain struck with the scantling, and another blow was struck with the scantling, and a pistol fired from the door. The third shot was the shot gun. Fanning gave back up the street. S. P. Brittain kept striking, and continued until Fanning turned and ran up the street. While Fanning was going back, five shots were fired at him by J. W. Brittain, four of them after the gun was discharged the last time. The first shot fired by J. W. Brittain was while he was standing in the door; he then stepped down on the sidewalk and moved towards Fanning. He thinks the pistol was fired once after Fanning turned to run. When Fanning fired the second shot he was in a position as if aiming to shoot. There were two gashes on his head.

On cross-examination, the witness stated that the scantling S. P. Brittain had was a piece that had been nailed across the door. Fanning said he and S. P. Brittain had rented the store and he had paid the rent and Brittain would not pay him back.

G. A. Williams, a witness for the state, testified as to the shooting, and said Fanning stooped and ran up the street at the last shot, and was about thirty or thirty-five steps above the Few store at the last shot, and twelve steps from J. W. Brittain, who had advanced about twenty steps. Fanning had his gun in a

shooting position part of the time, and J. W. Brittain had a Smith & Wesson pistol, calibre 32. It was about one hundred yards up the street from the Few store to Cunningham's store. The witness saw the ball when it was cut out of deceased's hand, and it looked like a ball of calibre 32. The scantling S. P. Brittain had was six or seven feet long, two inches wide and one inch thick, of pine, and had some nails in it.

W. D. Miller, for the state, testified that he saw S. P. Brittain when he commenced kicking and pushing the door, and told him to stop and let the door alone. Brittain said "I'll go in or die." Fanning walked towards the drug store and came back with his gun. The prisoners entered the store. followed by Fanning, who was ordered out. Fanning came out on the side-walk and was followed by S. P. Brittain. They stood facing each other, as if combating a subject, and while talking in this position a gun fired, and S. P. Brittain made a remark and an assault with a piece of plank he had brought out of the store with him. He struck ·Fanning, and firing commenced rapidly. When Fanning was struck he reeled and retreated ten or twelve steps, while J. W. Brittain advanced, firing, and witness told him to stop and he desisted. J. W. Brittain was firing in the direction of Cunningham's store. The second shot of Fanning's gun was in the direction of Few's store.

Samuel P. Brittain, one of the prisoners, was introduced and testified in their behalf. He stated that he had proposed to Fanning to rent the billiard room. Fanning did not agree to rent, but proposed a partnership, and they went into business. "I became dissatisfied, and told him I wanted to dissolve. He said 'all right.' We settled, and he wanted to continue to board with me. A final settlement was made, and all our business was closed on the morning of the shooting." He had paid rents out of the billiard room concern, and that was accounted for. They were not partners in the Few store, though they had spoken of it. About three hours after their settlement, on coming

down the street, he heard nailing, and went to see about it, and found Fanning nailing up the store. He told him there was no use of that. There was some cursing between them. Fanning swore he would kill the first man who entered. Witness went to a lawyer, who advised him he had a right to enter, and he went in. Fanning followed, with his gun in his hand towards him. Witness ordered him out, and he went out, having his gun pointed at his breast. Witness struck at him, struck the gun down, and it fired. He pointed the gun at J. W. Brittain and witness again struck at him several times. He stated that the relations between himself and his son and Fanning had always been of the kindest character.

On cross-examination, the witness said he went to look for his son to tell him the store had been broken open. He knew his son had a pistol, but did not see it when he pulled off his overcoat. When Fanning backed out of the house he followed him, but did not hit him the first blow; he struck at the gun; that he did not tell him to shoot, but did tell him to get out, and as he turned, he did say " d—n you, you may kill us, but you can't scare us"; that he struck several blows with the scantling, knowing that Fanning's gun was a breech-loader, and that such guns could be loaded very rapidly.

M. S. Justice, witness for prisoners, testified that he saw Fanning's gun, after the fight, on the counter of Mr. Tom's store. There were two cartridges lying by it that were bloody, and the witness thought they were loaded. The gun could still have been fired.

J. B. Arledge, examined for prisoners, stated that before the fight Fanning came to his store and said he wanted to buy a pistol, and, as he stepped out, said there would be the "biggest little hell kicked up after a while." J. W. Brittain was in the habit of carrying a pistol, and was and is in feeble health.

Dr. Whitted, the next witness examined for the prisoner as an expert, supported the testimony of the experts examined on the part of the state.

Preston Garren testified that about one-half hour before the fight, while he was standing on the platform of the billiard saloon, Fanning handed him his gun and asked him to put it in the drug store, and he handed it to Reeves and asked him to put it in the store.

The prisoners offered some evidence to show that the gun was empty immediately after the fight, and was broken.

The state, in reply, offered some evidence showing that Fanning was badly bruised, and was in a dangerous condition for five or six days, and the wounds on his head were such as to produce temporary derangement.

There was further testimony on both sides, but none that is deemed material to the points decided by this court.

The prisoners requested the court to charge the jury:

1. That the prisoners, upon the testimony, could not be convicted of murder.

2. That, although in indictments for murder, when on the trial it is admitted by the accused or proved by the state that the accused had committed the alleged homicide, the burden would be on the prisoner to show facts and circumstances to the satisfaction of the jury to mitigate the offence from murder to manslaughter, or excusable homicide, yet, where, upon the testimony, the offence could not be murder, and the question was whether it was a case of manslaughter or excusable homicide, the burden was upon the state to satisfy the jury beyond a reasonable doubt that the crime was manslaughter, and that in this case, unless the jury were satisfied beyond a reasonable doubt that the prisoners were guilty of manslaughter, it would be their duty to acquit.

3. That if, in this case, either from the testimony of the state's witnesses, or the witnesses of the prisoners, the jury, under the charge of His Honor, should find that the prisoners are not guilty of murder, then, before the jury could convict the prisoners, they should be convinced beyond a reasonable doubt

that they were guilty of manslaughter, and, unless the jury were so convinced, it would be their duty to acquit.

4. Where, on the trial of an indictment for murder, the state's testimony shows that the accused is not guilty of murder, it will not be presumed that the accused committed the homicide upon the *furor brevis,* or in .the heat of passion, but the burden will be upon the state to show to the jury beyond a reasonable doubt that the killing was done under such circumstances as to make the accused guilty of manslaughter. So in this case, if the state has failed to make out a case of murder against the prisoners, it will be the duty of the jury to acquit them, unless the state has satisfied the jury, beyond a reasonable doubt that they are guilty of manslaughter.

5. And on the trial of an indictment for murder, if the state fails to make out a case of murder against the accused, but the testimony of the state would make out a case of manslaughter, yet if the testimony offered by the accused would be sufficient to raise a reasonable doubt in the minds of the jury whether or not the accused was guilty of manslaughter, it would be the duty of the jury to acquit. So in this case, if the state has failed to make out a case of murder against the prisoners, but the testimony of. the state is sufficient to satisfy the jury beyond a reasonable doubt that the prisoners are guilty of manslaughter, yet, if the testimony of the prisoners is sufficient to raise in the minds of the jury a reasonable doubt as to whether or not they are guilty of manslaughter, it will be the duty of the jury to acquit. The jury must be satisfied beyond a reasonable doubt upon the whole case, taking into consideration as well the testimony of the prisoners as the testimony of the state, that the prisoners are guilty of manslaughter, or it will be their duty to acquit. It is not the duty of the prisoners, as between manslaughter and excusable homicide, to satisfy the jury that it is a case of excusable homicide, but the burden is always upon the state to satisfy the jury beyond a reasonable doubt that it is a case of manslaughter; and this is so, even in a case where *it is*

left to the jury to say whether the prisoners are guilty of manslaughter or of justifiable or excusable homicide. For, once the question of murder being got out of the way, there is no longer any presumption against the prisoners from the fact of the killing being admitted by the prisoners or proved by the state; but the state must then satisfy the jury beyond a reasonable doubt that the prisoners are guilty of manslaughter, and it will be sufficient for the prisoners to satisfy the jury of such facts and circumstances as will produce in their minds a reasonable doubt of the guilt of the prisoners to entitle them to an acquittal.

6. That if, upon the testimony, the jury should find that the prisoner S. P. Brittain leased the Few store for one year, and was sole lessee thereof, and the witness Fanning had no interest in said lease, but had nailed up the windows and doors of the said store, the said S. P. Brittain had the right to repossess himself of said store, and for this purpose to break open the doors and windows thereof, and that he might call to his assistance his co-defendant, J. W. Brittain.

7. That in order to repossess himself of the store, if the jury find that he was the sole lessee thereof, and that the doors and windows thereof had been nailed up by Fanning, the said S. P. Brittain might use all necessary force short of an actual breach of the peace, and might call to his assistance his co-defendant, J. W. Brittain.

8. That if, from the evidence, Fanning, when he entered the store, had killed the Brittains, or either of them, he would be guilty of murder.

9. That if Fanning entertained malice against the prisoners, just prior to the difficulty at the door, the law will presume that this malice extends up to the time of the fight.

10. That if J. W. Brittain had the pistol in the house, and not presented, he had a right to have it, if from the evidence the jury should believe that the house belonged to S. P. Brittain, and J. W. Brittain had a right to be there.

11. That if the jury should believe that Fanning entered the house, not having a conveyance of or right of possession to it, and then abandoned the same, Brittain had the right of entry, and could enter into the house at any time, even though he broke the door down to enter.

12. That if the jury believe that the Brittains entered the fight willingly, and Fanning had pressed them to the wall, so that they believed that to save their lives it was necessary to slay Fanning, then they would not be guilty of either murder or manslaughter.

13. That if the jury believe that Fanning assaulted the Brittains with his gun, and they believed he was about to do them some great bodily harm or take their lives, they would have been justified in fighting in self-defence, even though it resulted in the death of Fanning, and they had a right to pursue Fanning until they had disarmed him, although that resulted in the death of Fanning.

14. That if the jury should believe that S. P. Brittain rented the storehouse for himself and son, J. W. Brittain, to carry on the business of liquor dealers as partners, then J. W. Brittain had an equal interest in the house with S. P. Brittain, and as much right to be there as S. P. Brittain; or if they should believe that J. W. Brittain was in the house by invitation, then he had a right to be there.

These instructions were refused and the prisoners excepted.

The court, after defining in general terms murder, manslaughter and excusable homicide, to which no exceptions were taken by the prisoners, charged the jury as follows:

1. That their first inquiry was, Did the deceased, Samuel P. Cunningham, die of a wound at the hands of the prisoners, or either of them? That as to this they must be satisfied beyond a reasonable doubt, and if the evidence failed so to satisfy them, they should acquit the prisoners.

2. Upon a trial for murder, when the fact of killing with a deadly weapon (and a pistol is a deadly weapon) is proved or

admitted, the burden of showing matter of mitigation or excuse or justification is thrown upon the prisoner, unless it arises out of the testimony produced against him. It is incumbent on him to establish such matter, neither beyond a reasonable doubt nor by a preponderance of testimony, but to the satisfaction of the jury. Homicide is murder unless attended with extenuating circumstances, which must appear to the satisfaction of the jury, and if they are left in doubt on this point, it is still murder. Matter of mitigation or excuse may appear from the state's evidence or that offered for the defence, but in either case it is for the prisoner to satisfy the jury of the matters of mitigation or excuse. *State* v. *Boon*, 82 N. C., 637.

3. If one man deliberately kill another to prevent a mere trespass on his property, whether that trespass could or could not otherwise be prevented, it is murder. A man shall not, even in defence of his person or property, except in extreme cases, endanger human life nor inflict great bodily harm. *State* v. *Morgan*, 3 Ired., 186.

4. If the prisoners went to the house (Few store) intending to go in, and in case they were resisted by Fanning, to kill him, or to do him some great bodily harm, and if in the attempted execution of this purpose a shot from the pistol of John W. Brittain took effect upon Cunningham and killed him, it is murder.

5. If the prisoners went to the house, intending to go in and provoke Fanning to resist, and, if he resisted, to kill him or do him some great bodily harm, and if Fanning resisted them and they attacked him, the one with a scantling, the other with a pistol, and one of the shots took effect upon Cunningham and killed him, it is murder.

6. If the prisoners went to take possession of the house, and that was objected to by Fanning, and a sudden quarrel sprung up, and the prisoners, or either of them, was assaulted by Fanning, and they fought from passion and in heat of blood, and Cunningham was stricken and killed, it is manslaughter.

7. If the prisoners went to the house to go in it, and were willing to enter into a conflict with Fanning, and a conflict ensued between them and Fanning, and the prisoners acted in heat of blood, and if in this conflict a shot fired by one of them took effect upon Cunningham and slew him, it is manslaughter.

8. If the prisoners and Fanning had a contest about the house, and in this contest the prisoners and Fanning were willing to enter into a fight with each other, and they did have a fight, and if the prisoners in such fight acted in heat of blood and from passion, and if a shot from the pistol of one of them struck Cunningham, and from the wound he died, it is manslaughter.

9. If the prisoners went to take possession, not intending to enter into a conflict with Fanning, and were followed by Fanning, and S. P. Brittain was assaulted by Fanning, the prisoners not having brought on or provoked the conflict, and if S. P. Brittain had reason to believe, and did believe, he was about to be killed or suffer great bodily harm from the assault, if there was such assault, or from the conduct and acts of Fanning, he had a right to strike to protect and defend himself from such injury, and if John W. Brittain saw this assault, and had reasonable ground to believe, and did believe, that his father, Samuel, was about to receive such injury or suffer death, as has just been stated, he had a right to fight in defence of his father, and to use such force as was necessary to extricate his father from such danger, and if the prisoners thus fought, it is self-defence, and the prisoners should be acquitted. It is for the jury, and not the prisoners, to judge of the reasonableness of the prisoners' apprehensions.

10. If the prisoners went to the house to take possession, but with no intention to bring about a conflict, nor had provoked or brought about a fight with Fanning, and if Fanning made an assault upon either of the prisoners, such as endangered his life or put him in danger of great bodily harm, he had the right to defend himself, and each to defend the other, and to use such force as was necessary to free himself from this peril, and the

amount of force thus used will not be weighed with nicety, but if the force used is manifestly disproportionate to the attack, the law will not excuse him, if he uses such excess of force.

11. If the prisoners, by their conduct and action and language, provoked or brought about a conflict with Fanning, and were assaulted by Fanning, they cannot justify their assault upon him, if they did assault him, and if in such conflict Cunningham was slain, it would be murder or manslaughter as you shall find the facts under the preceding instructions, unless in the progress of the fight they were so sorely pressed—that is, put to the wall, so that there was no escape for them, and that they, or either of them, must kill or be killed or suffer great bodily harm.

To the charge, as given by the court, the prisoners excepted. Verdict of guilty of manslaughter.

The prisoners moved for and obtained a rule for a new trial :

1. For the refusal of the court to give the special instructions prayed for by the prisoners.

2. For error in the charge as given to the jury.

3. For that improper influences had been brought to bear upon the jury after the charge had been delivered to them and they had retired to make up their verdict.

In reference to this ground for a new trial, the court states the facts as found as follows: The charge of the court was given to the jury on the morning of Saturday, August 25th, and about the hour of 12 M. of said day the jury retired to consider of their verdict. They were in charge of a sworn officer, who had been instructed by the court to hold no communication with the jury, or any of them, except what was necessary to supply and attend to their necessary wants.

On Saturday afternoon or Sunday, the 25th or 26th, the deputy sheriff, who had charge of the jail (and before the jury had agreed on a verdict), called to the officer of the jury and informed him where he could be found in case the jury should agree and prisoners wanted in court; and while in conversation

with the officer of the jury, the deputy sheriff informed him (the officer) "that the prisoners' counsel had about given up their case, and that there was a great deal of anxiety about the case."

The officer stated this in the hearing of part of the jury, but did not think all of them heard it. Some of the jury said "that must be intended to influence the jury, but it would not influence them," and the officer stated that he did not suppose the deputy sheriff intended to influence them or to have that effect.

On Monday, August 27th, at about the hour of 9 A. M., the jury came into court and requested that the charge of His Honor should be repeated to them, which was done, in the presence of the prisoners and their counsel and the solicitor, and they again retired to consider of their verdict. At about 1 o'clock of the same day the jury returned into court and rendered a verdict of guilty of manslaughter as to both the prisoners. The jurors were then polled by direction of the court, and each juror responded that he found both the prisoners guilty of manslaughter, and the verdict was then recorded and the jury were discharged.

These facts, except such as were in the knowledge of the presiding judge, were shown to the court by affidavits.

The prisoners asked that some of the jurors who tried the case might be examined as to this charge of improper influence. The judge said he had doubts as to the propriety of examining the jurors to impeach their verdict, and referred to the case of *State* v. *McLeod*, as reported in Busbee's Digest, 336, No. 217 (1 Hawks, 344); and after some hesitation, he would himself take the statement of such of the jurors as were willing to make it, and called five of these jurors who had sat upon the case and asked them as to their willingness to testify in regard to this matter; four of them signified their willingness to be examined, and one of them stated that he would prefer to be excused. These jurors were sworn, and the judge was proceeding to examine the

32

first of them whom he called, telling counsel he (the judge) would himself take their statements, but that he thought it best not to permit the counsel on either side to examine them. The prisoners objected to this mode of proceeding, and insisted on their right to examine them by counsel. The court declined to allow this, and directed the jurors to stand aside without examination, and the prisoners excepted.

4. The prisoners then offered the same jurors as witnesses to be examined (in reference to what occurred in their presence) by their counsel, and cross-examined by the solicitor if he desired so to do. This the court refused, and the prisoners again excepted. The rule for a new trial was disallowed.

The prisoners then moved in arrest of judgment:

1. That the indictment did not sufficiently set forth the facts and circumstances of the alleged homicide.

2. That the bill of indictment stated in general terms that the wound inflicted upon the deceased was a mortal wound, while the evidence showed that it was not a *mortal wound*, but that blood poisoning supervened upon the wound, and that the immediate cause of the death of the deceased was blood poisoning. The indictment should have set out the cause of the death of the deceased with greater particularity.

The court refused to arrest the judgment and the prisoners excepted.

The judgment of the court was pronounced, and the prisoners appealed.

*Attorney-General,* for the State.
*Messrs. J. H. Merrimon* and *J. C. L. Harris,* for prisoners.

ASHE, J. It was not contended in the argument before us, nor does it seem to have been insisted upon in the court below, but that Cunningham, the deceased, came to his death in consequence of a wound received from a pistol fired by the prisoner, J. W. Brittain, at Fanning, in the rencountre between him and the prisoner. We therefore take that fact as conceded.

We do not think we are called upon to consider whether the evidence disclosed any feature of the crime of murder, for the prisoners having been found guilty of manslaughter only, the question for us to decide is, whether they were convicted of that offence according to law.

The prisoners prayed for numerous specific instructions, which were severally overruled by His Honor, and the prisoners excepted to each of his rulings. And we proceed, in the first place, to dispose of the exceptions in the order in which the instructions were asked.

The first exception to the refusal to give the instruction that upon the testimony the prisoners could not be convicted of murder, we deem immaterial. For the ruling of the court upon this instruction, in either way it may have been given, could not have influenced the verdict of the jury, for upon a careful review of all the testimony in the case, and upon the testimony of S. P. Brittain himself, we are of opinion there were no facts or circumstances disclosed in the evidence that would have warranted the jury in a verdict of excusable homicide.

Take the testimony of S. P. Brittain himself, and it fails to make out a case of excusable homicide. He says, after consulting counsel : " I went in, and Fanning followed, with his gun in his hand towards me. I ordered him out. He came out, having his gun pointed at my breast. I struck at him, struck the gun down and it fired," and on cross-examination he said he struck several blows with the scantling, which is shown by other testimony to have been a deadly weapon. Can any one who reads this, aside from the other testimony in the case, doubt who was the aggressor? They are in the house together; Fanning is ordered out, and he goes out, and Brittain follows him out of the house into the street with a deadly weapon, and a fight immediately ensues; and he says in all this he was acting in self-defence. We attach no importance to the fact that Fanning, while retreating from the house, if it be so, held his gun pointed at the prisoner, for it was most natural for him to have done so,

to prevent the assault of the prisoner with the scantling; but the fact that Fanning was retreating and never fired the gun until the blow was made by the prisoner with the scantling, when he had every opportunity to shoot before that, is conclusive to our minds that he was acting with forbearance, and had no purpose of using his gun, unless he was assailed. So far from Fanning's being the assailant, the combat was evidently brought on by the assault of the prisoner, S. P. Brittain, and although, after the combat had commenced, he found it impossible to retreat as the law required him to do, to save his own life he had killed Fanning, he could not have sheltered himself under the plea of self-defence.

LORD HALE lays down the law on this point that, "if A assaults B first, and upon that assault B reassaults A, and that so fiercely that A cannot retreat to the wall or other *non ultra*, without danger of his life, and then kills B, this shall not be interpreted to be *se defendendo*, but to be murder or simple homicide, according to the circumstances of the case; for otherwise we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo*. The party assaulted indeed shall, by the favorable interpretation of the law, have the advantage of this necessity to be interpreted as a flight, to give him the advantage of *se defendendo*, when the necessity put upon him by the assailant makes his flight impossible; but he that first assaulted hath done the first wrong, and brought upon himself this necessity, and shall not have advantage of his own wrong to gain the favorable interpretation of the law, that that necessity which he brought on himself should, by the way of interpretation, be accounted a flight to save himself from the guilt of murder or manslaughter."

This puts the plea of self-defence out of the question, and we are, therefore, unable to see how it is possible that the refusal to give such an instruction could have prejudiced the prisoners. When the facts of a case are such as to leave it an open question for the consideration of the jury whether the prisoners are

guilty of murder or manslaughter, or are excused upon the principle of self-defence, we can well understand how such a refusal might work to the prejudice of the prisoners; for every practitioner, who has had any experience in the trial of capital cases, knows how prone juries are to compromise a capital case upon the middle ground of manslaughter; but there is no room for such a compromise where the evidence, as here, is of such a character as to exclude any consideration of excusable homicide.

The prisoners, in support of this exception, relied upon the case of the *State* v. *Ta-cha-na-tah,* 64 N. C., 614; but that case is distinguishable from this, in that, there, there were circumstances (and this court so intimated) that might have justified a verdict of acquittal, and when the court below charged the jury " that if there was malice, the defendant was guilty, and if he fought with the deceased only in defence of his life, but yet had malice towards the deceased, then he was guilty of murder," this court held the instructions to be erroneous, because they could not see " that they did not operate prejudicially to the appellant." But in our case we cannot see how the ruling of the court could possibly operate to the prejudice of the prisoners, and even admitting the ruling upon the facts of the case to be erroneous, if it was in no degree prejudicial to the cause of the prisoners, it is no ground for a *venire de novo.*   *State* v. *Frank,* 5 Jones, 384.

The propositions contended for in the second, third, fourth and fifth instructions prayed for, are all to the same effect, and substantially maintained the proposition that in all capital cases the burden of proof is on the state to prove all the material allegations in the bill of indictment; and if on the whole evidence—that produced by the state as well as that offered by the prisoner— the jury have a reasonable doubt whether the prisoner is guilty of the crime charged, they are bound to acquit.

This is one of the propositions insisted upon by Judge WILDE, in his dissenting opinion in the famous case of *Commonwealth* v. *York,* 9 Metc., 93, and was urged before this court by counsel

for the prisoner in the case of *State* v. *Willis*, 63 N. C., 26. But this court, in that case, emphatically repudiated the proposition, and reiterated the doctrine that in all indictments for homicide, where the intentional killing is established by the proof, the killing is presumed to be malicious, and of course amounting to murder, until the contrary appears from circumstances of alleviation, excuse or justification; and it is incumbent upon the prisoner to make out such circumstances to the *satisfaction* of the jury, unless they arise out of the evidence against him. This doctrine has been announced, not only in *State* v. *Willis*, but in *State* v. *Ellick*, 2 Winst., 400; *State* v. *Johnson*, 3 Jones, 366; *State* v. *Haywood*, Phil., 376; *State* v. *Smith*, 77 N. C., 488.

The prisoners' counsel contended that, conceding that the proof of the intentional killing raised a presumption of malice, and without more showing the crime would be murder, but when by the proof adduced in the case, the offence of murder is put out of question, the burden is then shifted upon the state, and it must establish the crime of the prisoner; and if it leaves a reasonable doubt on the minds of the jury as to the grade of the crime, the prisoner must be acquitted. But this is not the law in this state. When the killing is once shown, either by the proof offered by the state or by the admission of the prisoner, the burden of proving all circumstances of mitigation, excuse or justification devolves upon the prisoner, and continues to rest upon him through every stage of the trial, for no distinction is recognized between the cases where the question is, whether the homicide is murder or manslaughter, and whether the killing is murder or excusable or justifiable homicide. *State* v. *Willis*, *supra;* *State* v. *Vann*, 82 N. C., 631; 1 East P. C., 279. And the principle of *"reasonable doubt"* has no application to the doctrine of mitigation. The rule in regard to that is, that the jury must be *satisfied* by the testimony that the matter offered in mitigation is true. *State* v. *Ellick*, *State* v. *Willis*, and *State* v. *Vann*, *supra*.

The sixth, seventh and eighth exceptions, touching the right of S. P. Brittain to enter the store, we do not regard as material to the question whether the prisoner, S. P. Brittain, was guilty of manslaughter; for the criminality of his conduct, in that view of the case, did not arise until he had left the house and followed Fanning into the street with a deadly weapon, after entering the store, as he unquestionably had the right to do. If he had remained there, this deplorable scene of bloodshed would most probably not have occurred.

The eighth and ninth exceptions, in regard to what would have been the character of the crime of Fanning if he had slain Brittain, involved questions that were altogether irrelevant; for whatever malice might have influenced Fanning, and what might have been his guilt in that event, could not in any degree have affected the criminality of the prisoners. If two men fight upon a sudden quarrel, upon equal terms, the one upon provocation and the other upon a predetermined intention to kill, the fact that the latter would be guilty of murder if he slew his adversary, cannot excuse the other if he should be the slayer.

The tenth exception, relating to J. W. Brittain's right to have his pistol in his father's store: He certainly was guilty of a violation of the law in carrying it along the street, concealed about his person; and he had no right to have it in the store if he carried it there, as the testimony very strongly tends to show, to use it against Fanning in the event of a difficulty with him.

The twelfth and thirteenth exceptions are without foundation, for His Honor, in the ninth instruction in the series given by him to the jury, substantially gave the instructions as prayed for by the prisoners.

The fourteenth exception is without evidence to support it, for there is no evidence in the case that S. P. Brittain rented the store for himself and his son, J. W. Brittain, to carry on the business of liquor dealers as partners.

There were no specific exceptions taken to the charge of His Honor, and we are of the opinion the principles of law, as

applicable to the facts of the case, were correctly expounded by him in the several instructions given to the jury; but those on the point of murder are subject to the observations above made on the exception to the first instruction asked by the prisoners.

Our conclusions are equally applicable to the cause of J. W. Brittain as to that of his father, S. P. Brittain, for, although a son may fight in the necessary defence of his father, yet in such cases the act of the son must have the same construction as the act of the father should have had, if it had been done by himself; for they are in mutual relations to one another. *State* v. *Johnson*, 75 N. C., 174; 1 Hale P. C., 484.

While impanelling the jury, a juror of the original panel was called, who had served on the jury within two years in the same court. The prisoners challenged him for cause. The challenge was overruled by the court, and the prisoners excepted. The jury, however, was made up without exhausting the challenges of the prisoners. The exception was properly disallowed; it was no ground for a *venire de novo*. *State* v. *Cockman*, 2 Winston, 95.

The prisoners' counsel moved for a new trial, on the ground that improper influences had been brought to bear upon the jury after they had retired to make up their verdict, and before they had agreed. It was shown by affidavits to the court that while the jury were in consideration, a deputy sheriff, in conversation with the officer of the jury, said to him "that the prisoners' counsel had about given up their case, and that there was a good deal of anxiety about the case." This the affiant stated, he repeated to a part of the jury, but he did not think all the jury heard it; that some of the jury said "that must be intended to influence the jury, but it would not influence them," and affiant stated further "that he did not suppose the deputy sheriff intended to influence them or to have that effect."

The counsel of the prisoners requested that some of the jury might be examined as to the alleged improper influence. His Honor, doubting his right to examine a juror for the purpose of

impeaching his verdict, said he would take the statement of such jurors as would voluntarily submit to be examined, and five of the jurors were called, four of whom expressed a willingness to be examined, but the fifth declined. The prisoners' counsel insisted upon the right of cross-examination, and thereupon His Honor declined to examine them. The prisoners' counsel then called the jurors and proposed to examine them, but His Honor refused to permit it, and the prisoners excepted.

In the ruling of His Honor upon these points there was no error. It is well settled that a juror cannot be examined as a witness to impeach the verdict of the jury of which he was a member. Thomp. and Mer. on Juries, §§364, 6; *State* v. *Smallwood*, 78 N. C., 560. And whether a new trial should have been granted to the prisoners, on account of the "communication" made to the officer in the hearing of part of the jury, was a matter not reviewable in this court. When the "circumstances are such as merely to put suspicion on the verdict by showing, not that there *was*, but that there might have been, undue influence brought to bear on the jury, because there was opportunity and a chance for it, it is matter within the discretion of the presiding judge." But if the fact be that undue influence was brought to bear upon the jury, as if they were fed at the charge of the prosecutor or prisoner, &c., then it would be otherwise. *State* v. *Tilghman*, 11 Ired., 513, cited in *Morris'* *case*, 84 N. C., 756.

Failing in the motion for a new trial, the prisoners' counsel moved in arrest of judgment for alleged defects in the form of the bill of indictment, but upon examination of the document, we find it drawn in the usual manner according to precedent.

Our conclusion upon the whole case is, that there is no error. This opinion must, therefore, be certified to the superior court of Henderson county, that the case may be proceeded with according to law.

No error.                                                                  Affirmed.