STATE v. JIM CAMERON.

(Filed 6 May, 1914.)

1.  Homicide—Premeditation—Trials—Evidence—Murder—Presump-
    tions—Burden of Proof.

    Upon the trial for homicide there was evidence tending to show that the prisoner worked for the deceased, and was angry and cursed him because he did not bring him some clothes he was expecting, and that he followed the deceased and killed him with a pistol, the deceased offering no resistance, and being unarmed.  *Held*, evidence sufficient that the homicide was willful, deliberate, and premeditated, and the court properly instructed the jury to return a verdict of guilty of murder either in the first or second degree; and his further instruction, that they could acquit the prisoner, was not error of which he could

STATE *v.* CAMERON.

complain. The charge of the court upon the law of premeditation, presumption of malice from the killing with a deadly weapon, and burden of proof, is approved.

2. Appeal and Error—Objections and Exceptions—Specific Exceptions.

An exception to the charge of the court must be to a specific proposition wherein error is alleged and pointed out, and an exception contained in an excerpt from the charge, containing several propositions, is not sufficiently definite for its consideration on appeal.

3. Indictment—Name of Deceased—Charge of Court.

Where the indictment was for murder of "John A. Blue," and the court charged that the trial was for murder of "J. A. (Archie) Blue," it is not error when there was no question of identity and no objection was taken at the time.

4. Trials—Instructions—Reading from Decisions—Appeal and Error —Harmless Error—Delays of Trial.

It is not commended that the trial judge while instructing the jury should lengthily read from decisions of the Court bearing, though correctly, upon the law relating to the controversy at issue ; but this will not be held for reversible error.

The long delays of the law in trials for homicide in this country, compared with that in other countries, discussed and the remedy suggested by CLARK, C. J.

ALLEN, BROWN, HOKE, and WALKER concur in the decision of the case.

CRIMINAL ACTION. Appeal by defendant from *Adams, J.,* at December Term, 1913, of MOORE.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*
*George H. Humber and Hoyle & Hoyle for prisoner.*

CLARK, C. J. The prisoner was indicted for the murder of John A. Blue on 11 August, 1913, and convicted of murder in the first degree. The testimony is that J. A. Blue, the deceased, was standing in the door of the commissary, which he ran in connection with his sawmill. The prisoner came around the house with a pistol in his right hand, looking angry, asked for

Blue, and went around the house to where he was. The witness heard talking between him and Blue, and then heard some one curse; he then went there and saw the prisoner backing from the door, who said: "Don't curse me, you (using a foul expression)." Blue replied: "You're another." Prisoner then said: "Man, you stand up here and curse me!" The prisoner was then in the act of shooting. The witness cried out to him: "Jim, don't do that!" But he shot at the time the witness spoke. The prisoner turned and left in a half run. He was three or four steps from the deceased when he shot. The deceased wheeled around and fell. The witness took him up and carried him to the bed, pulled off his shoes and went after his brother. When the witness got back, which was within an hour, Blue was dead.

Other witnesses testified to the fact that the prisoner worked for the deceased, and was angry because the deceased had not brought him some clothes. There is the testimony of Daniel Blue and other witnesses that the prisoner first used vile, insulting expressions, and that the deceased replied, "You're another."

The first exception is to the refusal of the court to charge, "There is no such evidence of premeditation or deliberation as would warrant the jury in returning a verdict of guilty of murder in the first degree." There is testimony that the prisoner came direct from his shanty to the commissary door where the deceased was standing, that immediately the deceased went to his office, when the prisoner followed around the corner of the building with a pistol in his hand; that he was mad at the time, and that he first passed offensive language. This was sufficient evidence upon which the jury could find that the homicide was willful, deliberate, and premeditated, and the court properly refused to instruct the jury otherwise.

Exceptions 2 and 3 are to the action of the court in permitting the solicitor to read to the jury part of the opinion in *S. v. Daniels,* 139 N. C., 550. On this point his Honor told the jury: "Revisal, 216, says that in jury trials the whole case, as well of law as of fact, may be argued to the jury. You will, of course, understand that the statement of facts in that case is given in the opinion only to explain the law. . . . You are to find

the facts from the evidence—the evidence of this case, not in the *Daniels case."* The prisoner also excepted (Exc. 16) to this charge, but we find no error in the above.

Exception 4 is because the judge in his charge told the jury that the defendant was indicted for the alleged murder of "J. A. (Archie) Blue." There was no question raised on the evidence as to the identity of the deceased, and there was no prayer to instruct the jury that there was a variance. If such point had been raised, the court would at once, in the interest of justice both to the prisoner and to the State, have permitted or required evidence that John A. Blue named in the indictment and "J. A." (or Archie) Blue were one and the same person. It would be a reproach to the administration of justice if such exception could be deemed fatal when there was no indication or suggestion of a variance and all the testimony was directed to the trial of the prisoner for the murder of the person named in the bill of indictment.

As to exceptions 5 and 12, the judge properly told the jury that there was no evidence of manslaughter or of self-defense, and that they could return a verdict either of guilty of murder in the first degree or of murder in the second degree, or not guilty. Indeed, the court might well have told the jury that in any aspect of the case, if the evidence was believed, they should find the prisoner guilty either of murder in the first degree or of murder in the second degree.

As to exception 6, the court charged the jury: "Premeditation is a prior determination to do the act in question, but it is not necessary that such determination shall exist for any considerable period of time before it is carried into effect. If the determination is formed deliberately and upon due reflection, it makes no difference how soon afterwards the fatal resolve is carried into execution. To constitute murder in the first degree there must be express malice, not merely malice which is implied." This instruction merely defined murder in the first degree under Revisal, 3631, and his Honor's definition of premeditation and deliberation is in accordance with our uniform decisions. Among them, *S. v. Jones*, 145 N. C., 466; *S. v. Barrett*, 142

N. C., 565; *S. v. Exum,* 138 N. C., 602; *S. v. Teachey, ib.,* 588; *S. v. Dowden,* 118 N. C., 1145; *S. v. Thomas, ib.,* 1113; 21 Cyc., 726.

The court further charged the jury: "Murder in the second degree is the unlawful killing of a human being by a person who has formed in his mind a purpose, design, or intention unlawfully to kill, with malice, but without premeditation and deliberation. Manslaughter is the unlawful killing of a human being without malice, express or implied, and without deliberation or premeditation."

"The intentional killing of a human being with a deadly weapon implies malice." The prisoner excepted to the following charge: "When such killing is admitted by the prisoner or shown by the State, nothing else appearing, the prisoner is guilty of murder in the second degree; and the burden then rests on the State to show facts and circumstances sufficient to raise or to aggravate the crime to murder in the first degree—that is, to show beyond a reasonable doubt that the prisoner willfully, with deliberation and premeditation, formed and entertained the fixed design to take the life of the deceased."

The prisoner also excepted to the following charge: "When the killing is admitted by the prisoner, or shown by the State, it is incumbent upon the prisoner to satisfy the jury of facts and circumstances sufficient to mitigate the offense to manslaughter or to excuse the killing of the deceased, unless they arise out of the evidence against him. The court has already charged that there is not sufficient evidence of such mitigating or excusing circumstances—that is, that there is no evidence of manslaughter or self-defense."

The prisoner also excepted because the court charged: "If you find from the evidence beyond a reasonable doubt, the burden being upon the State, that the prisoner intentionally shot the deceased with a pistol and inflicted a wound which caused his death, malice in that event is implied, and the prisoner is deemed to be guilty of murder in the second degree, and in that event this will be your verdict, unless the prisoner is guilty of murder in the first degree."

The above charge of the learned judge is carefully and clearly expressed in accordance with our precedents. *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ib.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Cox,* 153 N. C., 638; *S. v. Fowler,* 151 N. C., 731; *S. v. Clark,* 134 N. C., 698; *S. v. Brittain,* 89 N. C., 481.

Exception 11 is to a long excerpt from the charge containing a number of propositions. It is therefore an insufficient exception, for an exception must point to some specific proposition in the charge. *S. v. Johnson,* 161 N. C., 264. But after a careful reading of the whole matter excepted to, we find no error therein.

Exceptions 13 and 14 are taken to a statement by the court of the contentions of the State, and cannot be sustained. It is the duty of counsel to call the attention of the court at the time to any contention of the parties which is not supported by the evidence, or it will not be considered on appeal. *S. v. Blackwell,* 162 N. C., 672; *Jeffress v. R. R.,* 158 N. C., 215; *S. v. Cox,* 153 N. C., 638.

Exception 15 is because the court in its charge quoted the following language from *S. v. Daniels,* 164 N. C., 469 (which itself was quoted from *S. v. McCormac,* 116 N. C., 1036), as part of its charge: "While premeditation and deliberation are not to be inferred as a matter of course from the want either of legal provocation or of proof of the use of provoking language, yet all such circumstances may be considered by the jury in determining whether the testimony is inconsistent with any other hypothesis than that the prisoner acted upon a deliberately formed purpose. . . . The question whether there has been deliberation is not ordinarily capable of actual proof, but must be determined by the jury from the circumstances. The test is involved in the question whether the accused acted under the influence of ungovernable passion or whether there was evidence of the exercise of reason. The conduct of the accused just before or immediately after the killing would tend at least to show a state of mind at the moment of inflicting a fatal wound."

The above was a quotation by *Judge Daniel* from the latest expression of this Court on the subject at the time of the trial. The reading of lengthy opinions in a charge to the jury, though not advised, was held not reversible error. *S. v. Quick,* 150

STATE v. CAMERON.

N. C., 820. There could certainly be no objection even as to the advisability of quoting a short extract like the above.

We have already considered the sixteenth exception. The prisoner has had a fair and impartial trial, and we see no error of which the prisoner can complain.

*Speaking not for the Court, but for myself,* the objection, if any, to this trial might well come from the other side—organized society. This murder, in which, as it conclusively appears by the verdict of the jury, there were no extenuating circumstances, occurred more than eight months ago, and it is now just presented in argument on appeal. There is much and just criticism of the slow and cumbersome process of executing justice in this country, with its intricacy and uncertainty, which is in marked contrast with the procedure in Germany and England, where justice is swift and sure.

In Germany, in capital cases, the papers on appeal must be submitted by argument in the Supreme Court in a fortnight after the verdict, and it is very rarely that the Court neglects to hand down its opinion within four weeks at the furthest. Under the English law appeals in criminal cases must be carried up within ten days after trial, and ordinarily the Court renders its decision in from 17 to 21 days, although in murder cases this period is usually much shorter.

In England, objections to the admission or rejection of evidence are rarely if ever taken, and if taken, are not subject to review on appeal. Until 1908 there was no appeal in criminal cases in England, but the verdict of the jury was final and conclusive, subject only to pardon or commutation by the Executive Department. Since the act of 1908 an appeal in criminal cases is allowed, but not as a matter of course. In 1911 there were applications for appeal in only 7 per cent of the convictions. There was a total of 623 applications for such leave to appeal and leave granted in only 109 of these. Out of 165 appeals considered, in 104 the conviction was affirmed, in 36 the sentence was altered, and in 25 a new trial was granted. There were in England and Wales in 1911, with 40 millions of people, only 7 appeals on conviction of murder. In 6 of these the conviction was affirmed and in the other it was set aside.

The procedure in this State under which one charged with murder or other serious criminal offense is able to protract the controversy (for such it becomes) so that the punishment, if finally inflicted, sometimes comes one or two years after the crime was committed, deprives the punishment of its moral effect and its infliction takes on rather the appearance of revenge than of punishment. It is largely due to this, doubtless, that according to official statistics homicides have been so numerous in the United States, and especially in the southern part of the Union, as compared with other civilized countries. In 1896 the number of homicides in the United States was returned as 10,662, and in 1895 there were 10,500. Since then the number has decreased. The reports of the Attorney-General of North Carolina, whose publication is required by law for public information, show that for the year ending 1 July, 1912 (p. 75), there were 189 prosecutions in this State for homicide, exclusive, of course, of those lynched or not prosecuted for any other cause. The same reports show that in some years we have had from four to six lynchings in this State per year, while the executions by law were one or two. In 1894 our Attorney-General's report showed eight lynched and two legal executions, and the next year two lynched and no execution by law. These being reports required by law, we take official notice of them, and indeed they are required to be made that the public may benefit by the information. *S. v. Cole,* 132 N. C., at p. 1087; *S. v. Rhyne,* 124 N. C., at p. 859. Indeed, this information having been brought to the public, was largely instrumental in procuring legislation as to lynching, and since then there have been more executions by law and consequently fewer lynchings. Lynching has been defined as a "vote of lack of confidence by society" against the slowness and uncertainty of justice.

There has been a serious discussion going on throughout this country, which is broadening in its depth and sweep, not only by the public, but by the leading members of the profession and the American Bar Association under the lead of its president, ex-President Taft, as to the best methods of reform in our criminal procedure.

This is said by the writer, *speaking for himself alone,* under a belief that if the matter is called to the impartial considera-

tion of the Bench and Bar and of the people of the State, a speedier and more just method of trial may be initiated which, in this country and in this State, would have the same effect that it has had in Germany and in England of reducing the enormous number of homicides which brings reproach upon the good name of our people. Indeed, a legal journal of prominence in discussing the excessive number of homicides in the United States (at that time 10,000 annually, though now happily reduced), and especially in the South, and the paucity of convictions, which at that time averaged 240 of murder in the first degree (with 100 executions or less) out of over 10,000 homicides annually in the United States, felt justified in its own opinion in referring to certain States by name, among them North Carolina, as being *in this respect* "Commonwealths of retarded development."

This great number of homicides is due mostly to the slowness in trial and uncertainty of conviction. The law of this State says that death shall be the punishment for deliberate and premeditated murder. But in practice, the punishment is too often a moderate fine paid by the murderer, or his friends, to his counsel in the shape of a fee and a very far heavier fine laid upon the taxpayers for the cost of a long, tedious, and futile trial.

To a large extent North Carolina has reformed its indictments, under the impulse originally given by *Chief Justice Ruffin* in *S. v. Moses,* 13 N. C., 452, by doing away with redundancy of phraseology and many other technicalities which formerly were held sacred by counsel for the defense. Indictments may well be simplified still further. One great fault in our capital trials has been the vast discrepancy in the number of peremptory challenges, 23 being till lately allowed the prisoner without cause and only 4 to the State. This was to some degree modified by the act of the last Legislature, but our method of obtaining juries in both civil and criminal cases is still very far behind the best methods known. Another fault in our procedure is in the long delay before trial and in another long delay on appeal and the numerous exceptions entertained during the trial, especially as to the evidence which lengthens a trial inordinately and makes it unnecessarily expensive to the public. In

England and Germany the verdict is practically the conclusion of the proceedings against the defendant. In this country, especially when the defendant is a man of means, it is often merely the beginning of a controversy, as, for instance, in the *Becker case* in New York, which is now prominently before the public. Our government rests in the people, and knowledge of no part of its administration should ever be withheld from them. When there are wrongs, give the people full knowledge and they can be trusted to correct them. The reports of the Attorney-General are required by law to be printed for this very purpose of giving the people the fullest information.

No error.

ALLEN, J., concurring in result: The prisoner has been convicted of murder in the first degree and sentenced to death, and the judgment has been affirmed. This would seem to be enough. I do not think that statistics, not relevant to the decision of the cause, and which are often misleading, have any place in a judicial opinion. Nor do I concur in the indictment against the people of this State, or the administration of her laws. I am well assured that facts and conditions existent here do not justify it.

I am authorized to say that Justices WALKER, BROWN, and HOKE concur in this opinion.