STATE v. HENRY KENNEDY.

*Homicide, evidence and judge's charge in.*

1. Where the evidence showed that the prisoner could have escaped the threatened violence of the deceased, but slew him in the difficulty which ensued, and the judge charged the jury, "that if the

prisoner was so situated that he could escape, but preferred to shoot rather than to escape, he would at least be guilty of manslaughter." *Held* no error, and the jury were warranted in returning a verdict of manslaughter.

2. The words "at least," &c., were used in the sense of "clearly a case of manslaughter," and did not present the case as one of murder or manslaughter—taken in connection with other parts of the charge and the prisoner's plea of self-defence.

(*State* v. *Floyd*, 6 Jones, 392; *State* v. *Tacket*, 1 Hawks, 210; *State* v. *Ellick*, 2 Winst., 56; *State* v. *Massage*, 65 N. C., 480; *State* v. *Harris*, 1 Jones, 190; *State* v. *Dixon*, 75 N. C., 275; *State* v. *Hill*, 4 Dev. & Bat., 491; *State* v. *Ingold*, 4 Jones, 216, cited and approved.)

INDICTMENT for murder tried at Spring Term, 1883, of LENOIR Superior Court, before *McKoy, J.*

The prisoner was indicted for the murder of Lewis Croom. At fall term, 1882, he was put upon his trial, but the jury failing to agree upon a verdict, there was a mistrial and at spring term, 1883, he was again put upon his trial. There was a verdict of manslaughter and judgment of the court, from which the prisoner appealed.

. That part of the evidence produced on the trial and sent up as material to a proper understanding of the questions presented by the exceptions is as follows :

A witness, Robert Wright, testified that he was with the prisoner at the house of the deceased, that they went there for some fresh meat, as they had been notified that he had some for sale; they went in at the back door, and had some conversation, and the deceased's wife gave prisoner some cakes, and witness asked for and she gave him some cakes, and witness said to prisoner, "let us go home," and prisoner replied, "go on," that he would overtake witness, and the witness then went on, and after going thirty or forty yards saw prisoner coming and some one behind him running; that witness stopped in a cotton row, as it was in a cotton field, and got out of the path ; that the deceased threw a

brick-bat "right down" the path towards the prisoner; that there was a part of a brick-bat "right by the path;" that deceased went "right on;" the prisoner said, "stand back don't come on me;" the prisoner said that three times, and he further said, "if you come on me I will shoot you;" the deceased said, "shoot and be dammed;" that the deceased went on, had another brick in his hand, about two-thirds of a brick, at least more than half a brick; that he got as close to prisoner as within ten feet of him, and the prisoner fired the pistol, and deceased came by witness running; that before the shot the deceased came by the witness running; that he stopped to get the brick bat; he was in a half-walk and a half-trot; that he then slackened his pace, then the prisoner shot; there was a half brick two or three feet from his blood, and a pile of brick along the path between the house from which they came and where deceased fell after he was shot; that the brick found near the blood looked like it had been thrown. This witness was the only witness present at the time of the homicide.

There was evidence to show that the general character of the deceased was bad for violence, that he weighed one hundred and eighty, or one hundred and eighty-five pounds, that he had had his leg broken, but was as good a man after that as before.

There was other testimony as to the character of the ground where the deceased was slain.

The wife of the deceased testified, that after the prisoner left the house, she went out to get some wood, and she saw some one coming out from under the house of deceased; that he (her husband) came up and struck her, and started to kick her, and she left; that while going off, she heard a pistol shot; she then came back, and saw her husband shot in the eye.

There was much testimony circumstantial in its character, offered in corrboration, explanation and contradiction.

There was no exception to the charge of the judge to the jury, nor was there any exception to the rulings of the court upon questions of evidence. The jury retired to consider of their verdict, and after having been absent for some time, came into court, and upon being asked if they had agreed upon a verdict, answered that they had not. A member of the jury, speaking for the jury in the presence of the prisoner and his counsel, in open court, asked : " How far a man would have to run in the street before he would be pressed to the wall ?" The court replied that, " that was a question of fact for your common sense under the law as laid down by the court." The court said further, " If a man were pressing upon another in the street with a shot-gun, then the man thus pressed, would be put to the wall. Or, if a man were pressing upon another with a pistol, and it was as dangerous to flee as to stand, then he would be put to the wall. But if one were pressing upon another with a brick in an open field, that would not be putting him to the wall, if the one assailed could escape, unless the assault was fierce and sudden the shot which slew the deceased was fired during excitement and surprise, and then the prisoner would be guilty of nothing. But, if so situated that he could escape, but he preferred to shoot rather than to escape, then he would at least be guilty of manslaughter."

To the latter charge the prisoner excepted and appealed from the judgment pronounced.

*Attorney-General,* for the State.
No counsel for the prisoner.

MERRIMON, J., after stating the above. The exception of the prisoner fails to specify any particular ground of objection to the instruction of the jury complained of, and as we were not favored with an argument in his behalf, we are left to see whether in any aspect, it can be sustained.

It seems that the defence relied upon was that of self-defence, and it was insisted first, that the evidence produced on the trial did not warrant the instruction excepted to, and secondly, that if it did, and the jury should find the facts to be as supposed by the instruction, the prisoner was not guilty of manslaughter.

The court, in reply to an inquiry by the jury, after stating several propositions of law bearing upon the evidence, to which there was no exception, said, "But, if so situated that he could escape, but he preferred to shoot rather than to escape, then he would be at least guilty of manslaughter."

We think that the prisoner has no just grounds of complaint at this instruction. It was a favorable statement of the law for him, and the evidence was such as that it was the duty of the court to submit it to the jury in the aspect of manslaughter.

Manslaughter, at the common law and in this state, is the unlawful and felonious killing of another without malice, either express or implied. It is the absence of malice that distinguishes it from murder. Murder is of malice in a wicked heart. Voluntary manslaughter arises from sudden heat of passion. Manslaughter is divided into two branches: First, it is voluntary, as where one slays another without any malice on a sudden quarrel, or in the heat of passion; secondly, involuntary, as where one, while doing some unlawful act, unintentionally kills another; or while doing a lawful act in an unlawful way, without due caution and circumspection, kills another. And generally, when an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter, according to the nature of the act that occasioned it. If the killing be done in the prosecution of a felonious intent, or if the act done naturally tended to bloodshed, it will be murder, but, if no more was intended than a mere civil trespass, it will only amount to manslaughter. 4 Bl. Com., 191; Am. Law of Hom., 35 (1st Ed.).

If two persons upon a sudden quarrel fight, and one kill the other, it is voluntary manslaughter, *State* v. *Floyd*, 6 Jones, 392, because the slaying is of the heat of passion, and not of malice. So also, if a man be greatly provoked, as by pulling his nose, or slapping his face, or other like great personal indignity is offered him, and he at once slays the aggressor, this is not excusable, *se defendendo*, because there is no absolute necessity to do it to protect himself; it is manslaughter. It was said in *State* v. *Tacket*, 1 Hawks, 210, " that if an assault, made with violence or under circumstances of indignity upon a man's person, be resented immediately by the death of the aggressor, and he who is assaulted act in the heat of blood and upon that provocation, it will be manslaughter." So also, it was said in *State* v. *Ellick*, 2 Winst., 56, that if A is about to strike B, who is unwilling to enter into the fight and shows such unwillingness by words and actions, or otherwise, by going back, or warns A not to strike, and A presses on and strikes, or attempts to strike, and thereupon B kills with a deadly weapon, it is manslaughter, for there is a legal provocation, and the law ascribes the killing to "heat of blood," and not to malice. To the like effect is *State* v. *Massage*, 65 N. C., 480.

It is certainly true, as a general rule, that where one is attacked by another who intends to murder him, he may, if need be, kill the assailant, and he would in such case be justified, and where the attack is made with murderous intent, the person attacked is not bound to flee, but he may stand and kill his adversary if need be. *State* v. *Harris*, 1 Jones, 190; *State* v. *Dixon*, 75 N. C., 275, and cases there cited. But this rule does not apply in cases where the attack is a mere assault. In such case, the person assaulted shall not stand and kill his adversary, if there be a way of escape for him, but he may be allowed to repel force by force, and give blow for blow. 2 Bish. Crim. Law, § 633 *et seq.*, *State* v. *Dixon*, *supra*.

37

To reduce homicide to the degree of self-defence, it must be shown, that the slayer was closely pressed by the assailant, and that he retreated as far as he conveniently or safely could, in good faith, with the honest intent to avoid the violence of the assault. The jury must be satisfied that, unless he had killed the assailant, he was in imminent and manifest danger, either of losing his own life, or suffering enormous bodily harm. 4 Greenl. on Ev., § 116; Am. Law Hom., 36, 212; *State* v. *Hill,* 4 Dev. & Bat., 491.

In case of mutual conflict, in order to establish the defence of self-defence, it must appear that the party killing had retreated either as far as he could by reason of some interposing obstacle, as a wall, or the like, or as far as the fierceness of the assault would allow. There may be cases, though they are rare, and of dangerous application, where a man in personal conflict may kill his assailant without retreating to the wall. The assault in such case must have been so fierce as not to allow the person assailed to yield at all without manifest danger to his life, or of enormous bodily harm; then if there be no other way of saving his life, or avoiding such harm, he may kill his adversary instantly. The recognized distinction between this kind of homicide and manslaughter is, that here the slayer could not escape if he would; in manslaughter he would not escape if he could. Am. Law Hom., 213.

It has been held in a case where, in the course of a quarrel, the prisoner was menaced by the deceased, (whose strength was greater than his own) with a brick-bat, and the prisoner could have escaped by flight, but choosing to do so, turned around and mortally wounded his assailant with a dagger which he had concealed on his person, that the prisoner was guilty of manslaughter. *People* v. *Anderson,* 2 Wheeler's C. C., 408; *People* v. *Garratson, Ib.,* 348; Am. Law Hom., 214.

Now, applying these principles of law to the case before

us, it is very clear that if the facts of the case were as sup-
posed by the instruction excepted to, the prisoner was guilty
of manslaughter. It cannot be said that he was in immi-
nent danger of losing his life, nor was he about to suffer
enormous bodily harm. The deceased did not strike or hit
the prisoner; he threw one brick-bat in the direction the
latter was going; he picked up another and pressed on after
the prisoner, but it does not appear that he threw or offered
to throw it at him; he slackened his pace as he approached;
and the prisoner having warned him to stand back and not
to come on him, fired the fatal shot. It does not appear at
all that this was necessary to save his life or his person from
great, much less enormous bodily harm. Nor does it appear
that anything stood in the way to prevent his escape. There
was an open field about him. He might have escaped so
far as appears, if he had desired to do so. Besides, he was
armed with a most effective deadly weapon, a pistol. He
did not kill of necessity, nor were the circumstances such as
that he might stand and fight and kill. No man is justi-
fied in such a case where he can escape, if he chooses, pre-
fers, to shoot and kill. He may not kill of choice; he can
only be justified when he kills of necessity.

So that, if the facts were that the prisoner could have es-
caped the threatened violence of the deceased, but he pre-
ferred to shoot him rather than escape, he was guilty of
manslaughter.

The evidence certainly warranted the instruction in
question. It was far from developing a case of manifest
self-evidence. In view of the evidence, the verdict of man-
slaughter was not unreasonable. It tended to show, though
not very clearly, that the deceased suspected that the pris-
oner but a few minutes before the homicide, had been too
intimate with his wife, and as soon as he left the house of
the deceased, the latter left his secret place of observation,
struck his wife, and at once hurriedly pursued the prisoner

some distance in the open field, throwing a brick-bat towards him. It does not appear that it reached or hit him. That continuing to move on rather hurriedly, he picked up a second brick-bat, still moving on towards the prisoner in something more than a walk, when the latter said to him three times, " stand back, don't come on me;" and further said, " if you come on me I will shoot you;" that deceased said, " shoot and be damned "—moving on, and having the brick-bat in his hand. It does not appear that he offered to throw it, until he got within ten feet of the prisoner, slackening his pace as he approached him, when the prisoner fired the fatal shot.

The jury might well find from the evidence that the assault was not so fierce as to imperil the life of the prisoner, or expose him to enormous bodily harm, and that he did not slay the deceased of necessity. If it be granted that he had legal provocation, he being armed with a pistol, his warning, and the defiance of the deceased, and the absence of any effort to escape the threatened violence, went strongly to show that he killed the deceased of choice, and not of necessity.

In the instruction under consideration the court said that, if the facts were such as supposed, then the prisoner would be " at *least* guilty of manslaughter." The words " at *least* " were used in the sense of *clearly*, a case of manslaughter. It does not appear that they were emphasized, or intended to imply any view of the court unfavorable to the prisoner, and in connection with the other instructions then just given, they did not leave the impression on the minds of the jury, that the court thought the case one either of murder or manslaughter, and thus prejudice the prisoner before the jury. They were not used, and could not reasonably be construed, as the same words were in the case of *State* v. *Ingold*, 4 Jones, 216. In that case they were so used as to lead the jury to infer that the court inclined to the opinion

that it was murder, taking the case in its most favorable aspect. No such inference could reasonably be drawn in this case.

The judgment must be affirmed. Let this opinion be certified, to the end that the court below may proceed further in the action according to law. It is so ordered.

No error.                                  Affirmed.