STATE v. G. HOUSTON DOVE.

(Filed 15 November, 1911.)

1. **Murder—Self-defense—Evidence.**

When there is evidence tending to show that the prisoner on trial for the murder of deceased had a quarrel with him at a near-beer stand, followed by a scuffle, and soon thereafter the deceased struck the prisoner down as the latter was leaving; that the prisoner kicked at deceased as he ran under a horse hitched to a buggy standing there, then ran around the buggy and pursued the deceased down the road a short distance, where the deceased was afterwards found with his throat cut, with evidence of identification of the prisoner's footprints there and exclamations of the deceased heard by witnesses at the time and place, that prisoner "has cut me to death"; that the prisoner soon returned bloody, saying "it was the blood of the other fellow": *Held*, there was no evidence to support the plea of self-defense, especially where a judgment of manslaughter has been rendered on the verdict.

2. **Same—Aggressor.**

When it appears by the prisoner's evidence, upon a trial for murder, that he and the deceased had words which brought on a conflict resulting harmlessly, in which he testified that he caught the deceased by the coat-tail, when he fell to the floor; and soon thereafter there was another conflict on the same subject of quarrel, in which he testified that he kicked at the deceased

when he was going around a buggy which separated them, thus renewing the difficulty, the question of self-defense is excluded under the admissions of the prisoner. *S. v. Garland,* 138 N. C., 678, cited and approved.

### 3. Same—Justifiable Homicide.

The principles of justifiable self-defense held to be applicable in *S. v. Dixon,* 75 N. C., 279, where one may repel force by force, against one who manifestly intends or endeavors by violence or surprise to commit a known felony such as murder and the like, is never permissible in its application except when the prisoner is free from legal blame at the beginning and an actual assault is being made with the present purpose to kill and with the present ability, real or apparent, to carry out the felonious purpose.

### 4. Murder—Witness—Declarations—Evidence—Impeachment.

Upon a trial for murder evidence is competent on the part of the State tending to show on cross-examination declarations on the part of defendant's witness, after the occurrence and before the trial, made to an officer charged with the duty of arresting the prisoner, that the latter was a bad man, when it has a direct tendency to contradict the testimony he had theretofore given in the prisoner's favor.

APPEAL from *Daniels, J.,* at February Term, 1911, of GRANVILLE.

Indictment for murder. At the conclusion of the testimony, the solicitor made formal announcement that the State would not ask for conviction of murder in the first degree. The court hereupon charged the jury and verdict was rendered, "Not guilty of the felony and murder charged in the bill of indictment, but guilty of manslaughter." Judgment on the verdict, and the prisoner excepted and appealed.

*Attorney-General Bickett and Assistant Attorney-General George L. Jones for the State.*

*V. S. Bryant and B. S. Royster for defendant.*

HOKE, J. It was chiefly urged for error that his Honor declined to allow the jury to consider the plea of self-defense, being of opinion that there were no facts in evidence tending to support such a position. The homicide was shown to have occurred near Benehan, at about 8 o'clock at night, on 27

STATE *v.* DOVE.

January, 1911, and it appeared that the prisoner, the deceased, and others were at a near-beer stand, when the two had a quarrel, closed in a scuffle, and prisoner got deceased down and was on him; that deceased begged pardon; the parties got up and more beer was ordered, at prisoner's expense. The latter turned to go out, when deceased struck him on the side of the head, knocking him out of the door and flat down on his face. As he rose and got up, deceased ran by him and under a horse, which was hitched to a buggy, standing 7 or 8 feet from the door; that the prisoner kicked at deceased as he darted under the horse; then ran around the buggy and pursued the deceased down the road. Fighting was heard between them, and deceased was heard to say, "Lord have mercy, he has cut me to death!" One witness testified to this exclamation, and said further that he heard a voice, which he took to be prisoner's, reply: "If I haven't, I will." That after this, and in about two minutes from the time the two had disappeared down the road, the prisoner returned to the beer stand, saying deceased had gone home. When prisoner came back he was very bloody; was bleeding himself, from a cut in the neck or side of the head, apparently made by the bottle, and was very bloody on his shirt and both sleeves, the right sleeve being the bloodiest. In this connection a witness stated that prisoner said: "The blood on my arm didn't come out of me; it came out of the other fellow." The body of the deceased was found the next morning, with the throat cut, the doctor testifying that the wound was sufficient to cause death. Another witness said that the cut seemed to have been done from behind. About 150 feet from the beer stand, 30 or 40 feet from the road, in the direction the prisoner and deceased had gone, there was found a pool of blood and signs of a struggle, and the shoe of the prisoner fitted in some of the tracks near this place and going to it and returning to the road; and some little distance beyond this point was the place where the body was found, and there was the track of one person, that of deceased, from the place where the last struggle occurred, to the body.

The prisoner, testifying in his own behalf, admitted having entered into the struggle, in the beer stand; having kicked at

deceased as he went under the horse, and having followed him around the buggy and had a few licks with him, but denied having followed him down the road or having done the cutting. The prisoner's statement being, in part, as follows: "Joe said let's go to the beer stand. Four or five of us went, and I treated the crowd. Then Joe treated. While drinking beer he said, 'Some one told me you were going to throw some beer in my face, and I said if you did I was going to fight you.' I said it didn't amount to anything. Another time he said, 'Don't throw that beer in my face.' I told him that I would not, and whoever told him that I would, told a lie. He said whoever called him a lie had to fight. I caught him by the coat and he fell on the floor. Turned on his side. Tried to get up. I told him to wait. I believe he proposed to fight, and I did not want to fight, but if nothing else would do I could accommodate him. I told Mangum to give him beer. I turned to go home, and as I turned to step out he struck me on the side of the head with a beer bottle and knocked me out of the door. The buggy was 5 or 6 feet from the door. As soon as I recovered I jumped up and looked back in the house, then looked and saw him going under the horse. I turned and kicked at him. I ran around buggy and met him on the other side. We passed several licks. Several people were there then. We went a little further off and somebody cut me on the neck. I ran far enough around to get out of the way, 5 or 10 steps, then turned and came back in the door. I saw that I was bleeding when I got inside and don't know what cut me. Mangum said it was the beer bottle. I didn't feel the cut until I was outdoors, near the buggy, knocking. The doctor came. I washed my neck before he came and I didn't tell any one that the blood on my coat sleeve came from the other man. I don't remember having any knife. Joe said something about fighting and cutting and took out his knife. I did take my knife out, but don't know what became of it. I did not open it. I told them that they might find my knife at the door where the fight occurred."

There were other facts tending to establish guilt, and, on perusal of the entire testimony, there is no room for doubt that

the prisoner killed the deceased, and it is equally clear that his Honor correctly ruled that there was no evidence to support the plea of self-defense. According to his own statement, and whether the occurrence is held to consist of one fracas or two, the prisoner was an aggressor. In the first place, "he caught the deceased by the coat when he fell to the floor," and in the second place he kicked at the deceased as he fled, and then, going around the buggy, renewed the difficulty when there was no necessity for him to do so, real or apparent, for his own protection; and in either aspect, the principle of self-defense is excluded and the prisoner is guilty of manslaughter at the least. The doctrine applicable, as it obtains in this State, being stated in *Garland's case* as follows: "It is the law of this State that where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life." *S. v. Garland,* 138 N. C., 678, citing with approval Foster's Crown Law, p. 276, and *S. v. Brittain,* 89 N. C., 481.

Apart from the testimony as to the origin of the difficulty, there is no error to prisoner's prejudice, certainly in the verdict convicting him of the crime of manslaughter. *S. v. Kendall,* 143 N. C., 659-665; *S. v. Peter Johnson,* 48 N. C., 266. And this view of the homicide is the sufficient answer to another objection, earnestly insisted on by the prisoner, that his Honor declined to give his prayer for instruction No. 8, as follows: "A man may repel force by force, in defense of his person against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder and the like. In such cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and if he kills him in so doing, it is called justifiable self-defense," the prayer citing *S. v. Dixon,* 75 N. C., 279. The decision in *S. v. Dixon* announces a correct principle of law on the facts as they are there presented, but it has been several times referred to as sustaining a doctrine of "rare and dangerous application," and is never permissible except when actual

156—42

assault is being made with a present purpose to kill and with the present ability, real or apparent, to carry out the felonious purpose. *S. v. Kennedy,* 91 N. C., 572; *S. v. Blevins,* 138 N. C., 670. In this last case, speaking to the position, the Court said: "True, as said in one or two of the decisions, this is a doctrine of rare and dangerous application. To have the benefit of it, the assaulted party must show that he is free from blame in the matter; that the assault upon him was with felonious purpose, and that he took life only when it was necessary to protect himself. It is otherwise in ordinary assaults, even with deadly weapons. In such case a man is required to withdraw if he can do so, and to retreat as far as is consistent with his own safety. *S. v. Kennedy,* 91 N. C., 572. In either case, he can only kill from necessity. But in the one he can have that necessity determined in view of the fact that he has a right to stand his ground; in the other, he must show as one feature of the necessity that he has retreated to the wall." In this case the evidence tends to show that the prisoner went around the buggy to renew the assault on the deceased; followed him down the road, and killed without necessity. Therefore it is that the right of self-defense and the manner and extent of it, as correctly stated and approved in *S. v. Hill,* 141 N. C., 769; *S. v. Hough,* 138 N. C., 663, and *S. v. Dixon, supra,* may not be allowed to avail the prisoner. Nor can the exceptions to the rulings of the court on questions of evidence be sustained.

It appears that on the trial one J. H. Keith, a witness for the prisoner, had testified to his good character, and the State, over objections, was allowed to show declarations on the part of witness, after the occurrence and before the trial, made to the officer charged with the duty of arresting the prisoner, that the latter was a "bad man, dangerous when drunk, and might kill him, etc." The prisoner relying upon *S. v. Holly,* 155 N. C., 485, in support of the objection. In that well-considered opinion by *Associate Justice Allen* it was correctly held that a witness who had testified to the good character of a prisoner being tried for murder could not be cross-examined as to his knowledge or having heard rumors of *particular facts* or *occurrences* which

tended to impeach such character, nor for the purpose of weakening the force of the witness's testimony; but the evidence admitted is not of that character. On the contrary, it consisted of declarations from the witness himself, having a direct tendency to contradict the testimony he had given in prisoner's favor, and was clearly admissible, under the principles approved in *Holly's case* and the other decisions there cited. There is no error in the record, and the judgment of the Superior Court is affirmed.

No error.