STATE v. WALTER J. KENNEDY.

(Filed 28 April, 1915.)

**1. Murder—Self-defense—Quitting the Combat.**

In order to establish a perfect self-defense for a homicide in a fight wrongfully brought about by the defendant, especially when he has done so by a battery, it must be shown by him that, at a time prior to the act of killing, he had "quitted the combat"; and while this expression does not necessarily imply a physical withdrawal at the peril of life and limb, he must show an abandonment in good faith and that he had so signified to his adversary.

**2. Same—Prior to Killing—Time of Killing—Trials—Instructions.**

One who has brought about a fight resulting in the death of his adversary cannot maintain a perfect self-defense by showing that at the precise time the act was committed he was sorely pressed and could not abandon the combat with proper regard for his own safety; and where the evidence on behalf of the State tends to show that the defendant walked into the store of the deceased, quarreled with him, slapped him in the face while holding a pistol in his hand, and then shot and killed him with it, and on behalf of the defendant, that he had been first assaulted by the deceased and his brother, who knocked him against a partition in the barber shop, then to his knees, continuing to beat him on the head and shoulders, when he said, "Boys, get off of me" three or four times, then threatened to shoot, and as they did not do so, he fired the fatal shot: *Held*, upon this conflicting evidence, the charge of the court was correct, which, in substance, instructed the jury that if the defendant provoked the assault and fought willingly and wrongfully he would at least be guilty of manslaughter, unless, before delivering the fatal shot, he had in good faith abandoned the difficulty, and retreated as far as he could with safety.

**3. Evidence—Dying Declarations—Weight of Evidence—Court's Discretion—Instructions.**

While dying declarations are not made under oath and subject to cross-examination, and should be considered by the jury with à certain amount of caution, the way in which this caution may be expressed, in a charge to the jury, is, to a great extent, left to the discretion of the trial judge, who having properly charged thereon in this case, exception thereto that he had not used the language approved in a certain precedent will not be sustained on appeal.

APPEAL by defendant from *Lane, J.,* at November Term, 1914, of STANLY.

Indictment for murder of one John (called Johnnie) Morton.

It was proved that, on 7 March, 1914, about 5 p. m., at Oakboro, in said county, Johnnie Morton was shot and mortally wounded by Walter Kennedy, and died of the wound about four days thereafter.

There was evidence on the part of the State tending to show that Kennedy and one Pointer, a lightning-rod agent, were driving by the store of deceased, where the latter and William Osborne and several others then were, and received the impression that some one in the store cursed Pointer, referring to him as a "damned old lightning-rod agent"; that

the buggy was stopped, and Pointer, going in the store, inquired who cursed him, repeating the charge. Some one said no such talk was in here, and Kennedy replied, "You can't bluff me; some of you said it," and the two walked out, Kennedy going into a barber shop near by; that shortly thereafter, Columbus Morton, who had been in the barber shop, went into his brother's store and told him he could go and be shaved, as the brother could mind the store for him, and Johnnie walked into the barber shop, and as he was about to take his seat in one of the chairs, Johnnie said, "Kennedy, there was a mistake about that cursing," and Osborne said, "Yes, Walter, there was a misunderstanding," when Kennedy said, "You can't scare me or bluff me," and slapped Morton in the face, and Morton put his hand on Kennedy's shoulder and said, "Why, Walter, what do you mean?" and Kennedy shot him in the body under the arm, inflicting the wound of which he died.

Connor Smith and Finley Hinson, eye-witnesses of all or a part of the occurrence, and the dying declaration of the deceased were in substantial accord as to this version, and the account received confirmation from the declaration of Kennedy, telling how the bullet entered and ranged. The course of the ball also was in support of the position of the State that the pistol was fired and the wound inflicted while the parties were in an upright position.

One of the State's witnesses testified that Kennedy had his pistol out when he first slapped the deceased in the face, and it was argued by the State that the bruises found on the knees of Kennedy, after the killing, were caused in the struggle which occurred when the father and brother of the defendant took the weapon away from him.

The evidence of the defendant tended to show that, after the talk at the store, defendant went into the barber shop to get a shave, and, while he waited for the water to heat, Osborne came in and said: "Kennedy, I don't like to be accused of a thing I'm clear of," and W. said, "Mr. Osborne, I haven't accused you of anything you didn't do," etc., and he said, "You accused me of cursing Pointer, and I didn't do it," and W. said, "I don't say you are the man," etc. Osborne replied, "I'm not the man; I never fought any, but I'm not like the man who can't." "Then Johnnie came in and said, 'Walter Kennedy, you are trying to run my business,' and I replied, 'I am not, and I don't want to run any such business as you run, and you can't run mine.' And when I said that he struck me—right up here on the head. (Witness indicates on head.) I kinder dodged down, and he knocked me back against the partition right at the back of the stove. That partition is between where we were and the little back room, and there are some curtains hung up there. He knocked me against that partition, and then his brother, Lum Morton, come in. He is the one that was on the stand here yesterday. And Lum

Morton said, 'Damn him, let me get hold of him, and I'll fix him,' and he caught me in the collar and jerked me to my knees; both of them beating me in the back of the head and shoulders, he striking my right shoulder, and I said, 'Boys, get off of me,' three or four times, and I said, 'If you don't, I'll shoot you off,' and they wouldn't do it; so I drew my gun and fired. They bruised my shoulder and back of my neck; my head was sore, and my knees were scarred up and skinned. I hurt my knees on the floor. I would rear up and try to get up with them, and they would press me back to the floor, and that is how my knees got bruised. My clothes were cut, on the left side. · I asked them three or four times to get off. Lum Morton caught hold of me in the collar. It tore my collar loose in the hole. My clothes are there in that suitcase. Both of my coats were cut. My coat and overcoat, too. My collar was torn and my coat and overcoat were cut. It cut through the overcoat. I did not see the knife. I felt it when he cut my coat. I felt my coat pulling from me, and kinder zip, zip; sorter that way. (Collar, cravat, and overcoat were exhibited in court, and witness showed the torn and cut places on same.) I shot John Morton to save my own life. I thought they were going to kill me. They would not get off of me. When the gun fired, they left me. They ran out when the pistol fired, and my brother was the first man that came to me, and he said, 'Don't shoot any more.' His name is Vander. He took my gun and said, 'Don't shoot any more,' and I said, 'Here, take my gun, and keep them off of me.' I told him that and handed him my gun, and I walked out of the door. John Morton run out. I never did see him, but where they say he fell a good many were rushing up around there."

The testimony of the father and brother of the defendant was in substantial support of defendant's account. Cuts on his coat and bruises on his knees were proved to have been shown not long after the occurrence; certainly that same night or early next morning.

His Honor charged the jury, fully reciting the positions of the parties and much of the evidence.

There was verdict of guilty of manslaughter. Judgment on the verdict, and defendant excepted and appealed, assigning for the error a portion of his Honor's charge, as follows: "Now, the law is that if a person by his own conduct, either by words or acts, calculated and intended to provoke a difficulty, induces or provokes another to assault him, and a combat ensues, and the person who provokes another to assault him fights willingly and wrongfully, he is at least guilty of manslaughter, unless, before delivering the fatal blow or act, he has in good faith abandoned the difficulty and retreated as far as he can with safety, and then only can he be heard to plead self-defense, if he has been at fault in bringing on the difficulty."

And the refusal to give the following prayer in reference to the dying declarations of the deceased: "The admission of dying declarations is the exception to the general rule of evidence which requires that the witness should be sworn and subjected to a cross-examination. The solemnity of the occasion may reasonably be held to supply the place of an oath, but nothing can fully supply the absence of a cross-examination. Such declarations should be received with much caution on account of the absence of such cross-examination, and the jury in this case in passing upon the credibility of the alleged dying declaration in this case should take into consideration that the deceased was not subjected to a cross-examination."

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*J. C. Brooks, F. I. Osborne, R. L. Smith, R. E. Austin, G. D. B. Reynolds, A. C. Huneycutt, J. J. Parker for defendant.*

HOKE, J., after stating the case: In *S. v. Brittain,* 89 N. C., 481, and in reference to defendant's first exception, this Court held: "Where a prisoner makes an assault upon A. and is reassaulted so fiercely that the prisoner cannot retreat without danger of his life, and the prisoner kills A.: *Held,* that the killing cannot be justified upon the ground of self-defense. The first assailant does the first wrong and brings upon himself the necessity of slaying, and is therefore not entitled to a favorable interpretation of the law." And, in support of the position, *Ashe, J.,* delivering the opinion, quotes from *Lord Hale,* as follows: "If A. assaults B. first, and upon that assault B. reassaults A., and that so fiercely that A. cannot retreat to the wall or other *non ultra* without danger of his life, and then kills B., this will not be interpreted to be *se defendendo,* but to be murder or simply homicide, according to the circumstances of the case; for otherwise we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo.* The party assaulted, indeed, shall, by the favorable interpretation of the law, have the advantage of this necessity to be interpreted as a flight, to give him the advantage of *se defendendo,* when the necessity put upon him by the assailant makes his flight impossible; but he that first assaulted hath done the first wrong, and brought upon himself this necessity, and shall not have the advantage of his own wrong to gain the favorable interpretation of the law, that that necessity which he brought upon himself should, by the way of interpretation, be accounted a flight to save himself from the guilt of murder or manslaughter."

The same position is stated by the Court in *Garland's case,* 138 N. C., 675, as follows: "It is the law of this State that where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight

kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life. This is ordinarily true where a man unlawfully and willingly enters into a mutual combat with another and kills his adversary. In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he 'quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, kills his adversary for the preservation of his own life.'" Foster's Crown Law, p. 276. The same author says, on page 277: "He, therefore, who, in case of a mutual conflict, would excuse himself on the plea of self-defense, must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and to avoid immediate death. If he faileth in either of these circumstances he will incur the penalty of manslaughter," citing also the above passage from *Lord Hale* and *Brittain's case, supra,* in support and illustration of the principle.

It may be well to note that the term "quitting the combat," within the meaning of these decisions, does not always and necessarily require. that a defendant should physically withdraw therefrom. .If the counter attack is of such a character that he cannot do this consistently with safety of life or limb, such a course is not required; but before the right of perfect self-defense can be restored to one who has wrongfully brought on a difficulty, and particularly where he has done so by committing a battery, he is required to abandon the combat in good faith and signify this in some way to his adversary. The principle here and the basic reason for it is very well stated in case of *Stoffer v. The State,* 15 Ohio St., 47: "There is every reason for saying that the conduct of the accused relied upon to sustain such a defense must have been so marked in the matter of time, place, and circumstance as not only to clearly evince the withdrawal of the accused in good faith from the combat, but also as fairly to advise his adversary that his danger has passed and to make his conduct thereafter the pursuit of vengeance rather than measures taken to repel the original assault." And when, as heretofore shown, the counter assault is so fierce that the original assailant cannot comply with this requirement, then, in the language of *Lord Hale,* "He that first assaulted hath done the first wrong and brought upon himself this necessity, and shall not have the advantage of his own wrong to gain the favorable interpretation of the law, that that necessity which he brought on himself should, by way of interpretation, be accounted a flight to save himself from murder or manslaughter."

The doctrine as stated has been applied or recognized as sound in principle in well considered cases here and elsewhere and is given also in

text-books of approved excellence. *S. v. Pollard,* 168 N. C., 116; *S. v. Dove,* 156 N. C., 653; *S. v. Kennedy,* 91 N. C., 572; *Parker v. The State,* 88 Ala., 4; *S. v. Silas Darling,* 202 Mo., 150; *S. v. Smith,* 37 Mo. App., 137; *S. v. Hawkins,* 18 Ore., 476; *Kuney v. The People,* 108 Ill., 519; *S. v. Benham,* 23 Iowa, 154; 1 McLean Crim. L., sec. 309; Clark's Crim. L., p. 183; 25 A. and E., pp. 270-271.

In 1 Hawkins Pl. Cr., p. 87, the learned author states the position in even stronger terms, as follows (ch. 11, sec. 7): "According to some good opinions, even he who gives another the first blow, in a sudden quarrel, if he afterwards do what he can to avoid killing him, is not guilty of felony. Yet such a person seems to be too much favored by this opinion, inasmuch as the necessity to which he is at last reduced was at first so much owing to his own fault."

The charge of his Honor, then, was in strict accord with the doctrine as it obtains in this jurisdiction, and, this being true, we may not approve the argument urged upon us by the learned counsel, that a man who wrongfully brings on a fight may maintain the position of perfect self-defense because, at the precise time of the homicide, he was "sorely pressed" and could not abandon the combat with any proper regard for his safety, citing *Ingold's case,* 49 N. C., 217. According to the testimony, as it has been evidently accepted by the jury, his client, "armed with a deadly weapon, wrongfully began the difficulty by slapping the deceased in the face, and he never at any time after that ceased the combat or gave any sign of doing so. The statement in his own testimony that he said, "Get off me, boys," two or three times, and then, "Get off me, or I'll shoot you off," presents him in no such attitude as the law requires to restore his right of perfect self-defense, and while, according to his own account, he was being "sorely pressed" at the precise time of the killing, it was a necessity brought about by his own wrong, and, in our opinion, under the law and the testimony, he has been properly convicted.

True, there are numbers of decisions on this subject, and by courts of high repute, that the requirement that one in the wrong at the beginning shall cease the combat in good faith and signify this to his adversary before the right of self-defense is restored to him, should only apply when the original assault wos felonious, or at least of a character importing menace of death or great bodily harm; but in many of these the person indicted had been convicted of the offense of murder and the courts were dealing chiefly with the right to a new trial of that supreme issue, and may not have been specially attentive to the right of self-defense. This was, perhaps, true in *Ingold's case,* cited by counsel; but to the extent that *Ingold's case* gives countenance to the principle that one who has wrongfully commenced a fight may maintain the position of perfect

self-defense because, at the time, he is "sorely pressed," and without having given any intimation of his purpose to abandon the combat, the same is not in accord with our later decisions, and may be considered as disapproved. The case of *Foutch v. State,* 95 Tenn., 711, reported in 45 L. R. A., 687, and *S. v. Gordon,* 191 Mo., 114, reported in 109 Am. St. Reports, are to the effect that mere opprobrious or insulting words, though resulting in a difficulty, should not, of themselves, be held to deprive a man of the right of self-defense; decisions that are not apposite to the facts presented in this record and which may not, in all cases and necessarily, antagonize the principles we approve in the disposition made of the present appeal.

On the second exception the prayer of defendant in reference to the dying declarations is taken, in exact terms, from the opinion in *S. v. Williams,* 67 N. C., pp. 13-14. An examination of the case, however, will disclose, as suggested in the argument of the State's counsel, that the learned judge, in excluding certain declarations, was stating in general terms the reasons for receiving such declarations in evidence and as a caution to courts in reference to their admissibility, and was not intending to lay down any special formula in which the caution should be expressed in a charge to the jury. In the present case the judge did caution the jury, reminding them that the declarations were not made under oath nor at a time when deceased could have been subjected to cross-examination, and instructed the jury that "having been made in the fear of impending death and after hope of life was gone, the law says they may be given such weight, if the jury sees fit to do so, as they would have received if they had been made under sanction of an oath. The law says that no superstitious effect is to be given a statement because it is a dying declaration."

While these declarations are to be weighed with caution, and the judge should so tell the jury, the way in which the caution should be expressed is, to a great extent and very properly, left to the discretion of the trial judge, and in this instance the charge of his Honor is not dissimilar to the form approved in *S. v. Whitson,* 111 N. C., 395.

There has been no reversible error made to appear, and the judgment of the court is affirmed.

No error.