STATE v. DAVE EVANS.

(Filed 28 March, 1919.)

**1. Homicide—Murder—Deadly Weapon—Malice—Intent—Affray—Evidence —Nonsuit—Trials.**

Evidence that the prisoner had personally threatened the deceased, for whose unlawful killing he was being tried, and had prepared himself therefor with a pistol; that the deceased went out to meet him, upon his return, with the wooden handle of a cant-hook, and having engaged in an affray was fired at three times by the prisoner, one or two of the shots having been fired as the deceased was retreating, is sufficient to infer any previous malicious intent on the part of the prisoner to kill the deceased with the pistol, and to sustain a verdict of murder in the first degree; and there being also evidence sufficient to convict him of murder in the second degree, a motion for judgment as of nonsuit upon the evidence was properly denied. *S. v. Atwood*, 176 N. C., 704; *S. v. Crisp*, 170 N. C., 755; *S. v. Myrick*, 171 N. C., 788, and other like cases, cited, applied and approved.

**2. Appeal and Error—Instructions—Verdict—Harmless Error—Murder.**

Where there is evidence sufficient for the consideration of the jury for a conviction of the prisoner, being tried for homicide, of murder in both the first and second degree, error, if any committed by the trial judge, in instructing the jury upon the law relating to murder in the first degree is cured by the verdict convicting the prisoner of the lesser crime.

**3. Trials—Argument—Stenographer's Notes—Evidence.**

The solicitor, upon the trial of a homicide, may read the transcript of the evidence made by the official stenographer in the case appointed under the provision of the statute in contrasting the evidence of the State with that of the defendant and arguing to the jury inferences therefrom, and an objection on the ground that the cross-examination of witnesses had not been typewritten is untenable.

**4. Appeal and Error—Instruction—Trials—Argument—Race Prejudice.**

Where the solicitor, upon a trial for a homicide wherein the defendant was a colored man, has argued to the jury that a white man, who was a disinterested witness, had testified to certain facts, exception that his remark tended to prejudice the jury on account of race or color cannot be sustained, it appearing that the trial judge instructed the jury in strong and forceful language, among other things, that it would be "cowardly perjury" for them to be influenced by such consideration, which removed any prejudice, if any, that might otherwise have been caused. The charge of the court upon this subject is not objectionable.

**5. Appeal and Error—Objections and Exceptions—Trials—Ground for Objections.**

The appellant will be confined, on appeal, to the ground of objection stated on the trial, and where the exception is to the remarks of the solicitor to the jury upon the trial for a homicide, which were perfectly proper in one aspect, we cannot sustain an exception which was taken after the trial that they were prejudicial upon another ground.

ACTION tried before *Lyon, J.,* and a jury at August Term, 1918, of CUMBERLAND.

The prisoner was indicted for the murder of Vivian L. Bundy, and was convicted of murder in the second degree.

The State's evidence tended to show that Bundy, the deceased, was woods boss of a gang of sawmill hands, of whom the defendant, Dave Evans, was one. W. M. Dixon, paymaster and general manager of the mill, had loaned the defendant $2.50 the Saturday before and had told Bundy and Walker, who ran the sawmill, to get the checks for it when Evans came for settlement the following Saturday. The State's witness, R. T. Walker, testified: "The defendant worked out enough to pay back the $2.50, and Bundy asked Dave for his checks. Dave said he would give them to Mr. Dixon or pay him the money. Bundy said it was no use to do that as the others had given him their checks. Bundy told Dave three times to get out of the commissary; witness thought it was over with and went into the back part of the store. Dave picked up a bottle. Dave said, 'God damn him, I'll get him; he thinks he is the only bully around here.' Dave then left in his wagon in which there was sawdust. He lives about a mile and a half from the mill. He came back in a short time; he had a brick; the witness talked with him, and Dave gave him the checks. The witness told him he had better go off and not have any trouble about the matter, and Dave walked off. This was outside the commissary. When the witness went in Bundy asked him if he would be there a while, and Bundy went out. Bundy said, 'You've got a brick for me, have you?' and Bundy came back, picked up a cant hook, and went out. Witness heard three shots and went to the door to see what was the matter; he saw Bundy walking away when Dave shot him again; he heard three shots before he went to the door; Dixon was paymaster at the mill and Bundy woods boss; it was a new cant hook handle with no hook on it."

W. M. Dixon testified as follows: "He lives eight miles from Dunn and is general manager of the sawmill and saw part of the homicide; he was driving a Ford car, and as he turned in towards the mill he saw two men who seemed to be in combat, then he had to look at his car and heard a shot; looking up he saw smoke. Both men were in down position. He saw one of the men shoot again and again; the white man straightened up and started to run off timid-like, as though he was weak. He got off something like 25 or 30 feet from the other man and another shot was fired when Bundy was near the logs on the tramroad; the witness was then 60 or 70 yards from the main road; he saw Evans look back and start running down the tramroad. Bundy called to him, saying that he was dying, and came meeting him and told him to take him to the hospital as quick as he could. The witness told Bundy maybe he was not so bad off, and the witness jumped out of the car and helped Bundy in; he did not see the first shot; at the second shot

the men were a few feet apart, and the same at the third shot; he saw nothing in Bundy's hand when he threw up his arms; Bundy got off 30 or 40 feet at the fourth shot; the witness was then about 200 yards away from them; Bundy's back or left side was towards Evans when he shot the last time, Bunday having turned to the left to catch on the logs, and nearly all of the mill hands were at the store during the shooting."

N. H. McGeachy, sheriff of the county, testified that "he arrested defendant at his sister's house, and his sister had locked the doors and told him not to enter the house; Dave's pistol was under the pallet on which he was lying and three bullets had been shot out of it."

Dr. Parker testified that "there were three wounds in Bundy's body, one at the left nipple, which in his opinion went straight in for if it had ranged to the right it would have perforated the heart, and the heart was not perforated; one through the left forearm, which went straight through; and the third and last, in the left flank, and this ranged to the right making three perforations in the intestines. This wound in his opinion was the chief cause of Bundy's death."

There was evidence on the part of the prisoner tending to show, as it is correctly stated by the counsel of the prisoner, the following facts: "The deceased and the defendant were working at a sawmill of which W. M. Dixon was paymaster. Dixon had loaned defendant $2.50 which was due the day of the homicide. On being given his time checks deceased asked defendant for his checks, and he replied that he was going to give them to Mr. Dixon when he came. Deceased cursed defendant and ordered him out of the commissary. Evans went home after other checks. While eating dinner his wife called him and told him she heard a car going down the road which defendant thought was Mr. Dixon's, so he went on back to the mill to pay him, but found he had not arrived. He joined some of the other hands in throwing bricks at other bricks thrown in the air. R. T. Walker, who ran the sawmill, then came out of the commissary and defendant asked him about turning over the checks to Mr. Bundy, and defendant gave them to Walker, who went back in the commissary, when Bundy asked Walker if he would be there a while, and Bundy went out to defendant, and he and defendant talked together. Deceased cursed defendant and ran back in the commissary and got a cant hook handle and came out again. Defendant ran and deceased ran after him. Defendant ran 75 yards when deceased knocked him down with the cant hook handle, near a tramroad. Deceased ran by him and turned and came back and was striking defendant, who was on the ground. Defendant pulled out his pistol while on the ground and shot three times, and at the third shot Bundy had the handle drawn

back to strike again. Deceased had three bullet wounds. He died on Monday after the shooting on Saturday."

There was also evidence from which the jury might reasonably infer, if they believed it, that the prisoner, after the first colloquy with the deceased, went to his home, one and a half miles distant from the saw-mill, to get his pistol, having picked up the bottle, cursed the deceased, and sworn that he would get him; that he did get the pistol and returned in a short time to the mill, when the affray took place, the deceased using the cant hook, and the prisoner the pistol, and the jury might also have properly inferred that the prisoner acted with express malice, deliberation and premeditation, and that his purpose was to arm himself and then to return to the mill and provoke the fight, with the intent to slay the deceased when he had the chance.

The solicitor, in the course of his argument, was contrasting the evidence of the State with that of the prisoner, and in doing so stated that there was one disinterested white witness whose evidence should be believed, Mr. Dixon's; that it was not necessary to trust to memory as to what this witness said, for he had the typewritten evidence of the court stenographer's notes, which he would read. Upon objection, the court stated that the typewritten evidence had been handed to him by the court stenographer. Defendant again objected and excepted. The solicitor again proceeded to read to the jury from said papers a portion of Dixon's evidence, and again defendant objected and excepted. He also excepted for the further reason that it was incomplete in that only the notes of the direct evidence of the State's witnesses, Walker and Dixon, had been written out and not their cross-examination, nor the evidence of any other witness.

Several witnesses testified that the prisoner's character is bad, but the most of them stated that they had not heard anything against him until the other shooting affair, which occurred six months ago.

There was other evidence in the case not necessary to be now stated. The prisoner's testimony tended to show a clear case of self-defense, and this was admitted to be so by the Attorney-General in his brief and argument.

The court charged the jury, in part, as follows:

"The defendant, Dave Evans, is indicted for murder. There has been something said about his being a negro and the deceased a white man. I want to say to you, gentlemen of the jury, that it would be a sad day for North Carolina if, in the administration of the law, juries or courts would have two laws—one for the colored man and one for the white man. There is but one law known and recognized among the people of the State, and that law is administered the same for the white man as for the colored man, and the same for the colored man as for the

white man, and no brave man, under his oath, will permit the fact that the defendant is a colored man to influence his verdict one way or the other. Only a coward would be guilty of such cowardly perjury. As I have said to you, the defendant is indicted for murder, charged with the murder of Vivian L. Bundy, and every person charged with crime is presumed to be innocent until his guilt is proven, and the defendant in this case cannot be convicted unless the State satisfies you from the evidence of his guilt. The law of this State does not permit me to express, either directly or indirectly, to the jury an opinion upon the facts of the case, weight of the evidence, or the credibility of the witnesses. These are matters exclusively for the jury, and the court has not consciously done or said anything to influence you one way or the other. It is the duty of jurors to take the law from the court and the evidence from the witnesses. You are to determine what facts have been established by the evidence, and to such facts apply the rule of law given by the court, and return a verdict accordingly, regardless of consequences either to the State or to the defendant. There are four verdicts that you can render in this case: First, a verdict of murder in the first degree; second, a verdict of murder in the second degree; third, a verdict of manslaughter; and fourth, a verdict of not guilty."

The court then stated the facts of the case as the jury might find them to be, and explained the law fully and carefully, dwelling upon every phase of the testimony.

The jury found the prisoner guilty of murder in the second degree. Judgment, and appeal by him.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*W. C. Downing and Sinclair & Dye for defendant.*

WALKER, J., after stating the case: The motion for a nonsuit was properly overruled. As we have said in our statement of the case, there was evidence upon which the jury might well have concluded that the prisoner was the aggressor in the quarrel with the deceased; that he went to his home for the purpose of getting his pistol and thereby preparing himself for the combat, so that he would have the advantage of his adversary, and that this was done with the purpose and intent of engaging in the fight and slaying the deceased at the first opportunity. He was willing and ready for the fray, and entered into it with deadly purpose. But the jury, it seems, took the lenient view and convicted him of the lesser crime. There being ample evidence of murder and of manslaughter, the assignment of error, which is based upon the allegation that there was none, cannot be sustained.

The first, second, seventh, eighth, eleventh, thirteenth and fourteenth

exceptions assign errors in the rulings or the charge, relating solely to murder in the first degree, but the prisoner was acquitted of this offense, and therefore error, if there was any, proved to be harmless. *S. v. Bryson,* 173 N. C., 803; *S. v. McCourry,* 128 N. C., 594; *S. v. Casey,* 159 N. C., 472. If there was any error in respect to murder in the first degree it was favorable to the prisoner, as the charge did not, upon the facts to be inferred from the State's testimony, comply fully with the principle as stated in *S. v. Brittain,* 89 N. C., 481; *S. v. Garland,* 138 N. C., 675; *S. v. Kennedy,* 169 N. C., 326; Foster's Crown Law, p. 277, and the rule as formulated by *Lord Hale* and quoted by *Justice Ashe* in *S. v. Brittain, supra.* There may not have been any positive or affirmative error, even in favor of the prisoner, in this part of the charge, but the court made no distinct reference or application to the principle just stated, and we think there was evidence to warrant it. But, as has been said, if there was error in this respect the prisoner assuredly has no reason to complain of it.

The exception as to the remarks of the solicitor is without merit. He had the right to refer to the evidence in his argument for the sake of greater accuracy. The notes of the evidence were taken by an official stenographer appointed under the authority given by a statute, and it will be presumed at least *prima facie,* and in the absence of any showing to the contrary, that they were correct. There is no suggestion that they were not, but the ground of objection is that the cross-examination had not been typewritten. There is no proof that the solicitor misquoted the testimony, but every reason to believe that he did not. He was careful of the prisoner's rights and would not trust to his own memory, but, to be just to the prisoner, he referred to the notes as a safer and more reliable source from which to draw an accurate reproduction of what the witness had said, using his own language. There was nothing wrong in this. The court correctly instructed the jury as to how they should pass upon the evidence, as follows: "These, weight of evidence and credibility of witnesses, are matters exclusively for the jury, and the court has not consciously done or said anything to influence you one way or the other. It is the duty of jurors to take the law from the court *and the evidence from the witnesses. You are to determine what facts have been established by the evidence.*" (Italics ours.)

If the solicitor should not have attached more importance to the testimony of the witness W. M. Dixon because he was a white man, and thereby drawn the color line, as the prisoner's counsel contended, the court very fully and in emphatic language counteracted any prejudice that could have been engendered thereby, even to the extent of telling the jury that it would be "cowardly perjury" to be influenced by such a consideration. We have no idea that the solicitor intended to arouse

any prejudice against the prisoner by his remark. The word was incidentally used rather than intentionally or designedly. The point was that his only witness to the material part of the transaction, who had a clear view of the scene of the tragedy, happened to be a white man who was entirely disinterested. But if there was any evil in the argument, as drawing the color line, the court swept it from the case by his trenchant reference to it. In the administration of the law by the courts of this State, every citizen stands upon an equality before the bar of justice, and the judge so stated. It may be further said that the objection to the remarks of the solicitor were general and there were two distinct propositions, the exception to one of which we have already overruled. *S. v. Ledford,* 133 N. C., 714; *Quelch v. Futch,* 175 N. C., 694; *Caldwell County v. George,* 176 N. C., 602. The ground of objection, based upon drawing the color line, was not distinctly assigned until the brief of the prisoner's counsel was filed. The court had the right to infer from the form of the objection, when first taken, and the same inference also is to be drawn from the assignment of error, that the sole ground of objection was to the reading of the typewritten notes of the witness' testimony. The objection, therefore, comes substantially within the rule that an appellant is restricted to the ground of objection to evidence stated below. *Kidder v. McIlhenny,* 81 N. C., 123; *Rollins v. Henry,* 78 N. C., 342; *Ludwick v. Penny,* 158 N. C., 104, and also within the rule stated in *S. v. Tyson,* 133 N. C., at p. 699, where we said that a party will not be permitted to treat with indifference anything said or done during the trial that may injuriously affect his interests, thus taking the chance of a favorable verdict, and afterwards, when he has lost, assert for the first time that he has been prejudiced by what occurred. His silence will be taken as a tacit admission that at the time he thought he was suffering no harm, but was perhaps gaining an advantage, and consequently it will be regarded as a waiver of his right afterwards to object. Having been silent when he should have spoken, we will not permit him to speak when by every consideration of fairness he should be silent. We will not give him two chances. The law helps those who are vigilant—not those who sleep upon their rights. He who would save his rights must be prompt in asserting them. We do not think, in the most favorable view to be taken for the prisoner in the present case, that there was any such abuse of the judge's discretion, if there was any at all, to require a reversal. "The conduct of a trial in the court below, including the argument of counsel, must be left largely to the control and direction of the presiding judge who, to be sure, should be careful to see that nothing is said or done which would be calculated unduly to prejudice any party in the prosecution or defense of his case, and when counsel grossly

abuse their privilege at any time in the course of the trial the presiding judge should interfere at once, when objection is made at the time, and correct the abuse.  If no objection is made, while it is still proper for the judge to interfere in order to preserve the due and orderly administration of justice and to prevent prejudice and to secure a fair and impartial trial of the case, it is not his duty to do so in the sense that his failure to act at the time, or to caution the jury in his charge, will entitle the party who alleges that he has been injured to a new trial. Before that result can follow the judge's inaction, objection must be entered at least before the verdict."  *S. v. Tyson,* 133 N. C., at p. 698; *Knight v. Houghtaling,* 85 N. C., 17.  The trial was perfectly fair and impartial, and the verdict was fully justified by the evidence.  There is not the slightest appearance of prejudice or bias, but, on the contrary, it would seem that the jury was merciful to the prisoner.

The charge of the court covered the entire case, in every phase of it, and the instructions were correct and in accordance with the most approved precedents.  It was not only an adequate charge, but in all essential respects an excellent one.  If there was any defect, there was none which prejudiced the prisoner's case in the least degree.

1. A killing with a deadly weapon, admitted or proven, requires the prisoner to satisfy the jury as to the existence of all matters of mitigation or excuse relied on by him.  The latest applications of this doctrine are to be found in *S. v. Atwood,* 176 N. C., 704; *S. v. Johnson, idem.,* 722, where the authorities are collected.

2. Manslaughter is the unlawful killing of another without malice, an instance of the crime so defined being where one unlawfully kills another by reason of the anger suddenly aroused by provocation, which the law deems sufficient; the anger being naturally aroused from such provocation and the killing being done before time has elapsed for passion to subside and reason to resume its sway.  *S. v. Merrick,* 171 N. C., 788, and cases there cited.

3. The legal effect of "beginning the fight willingly" and "cooling time" have been recently elaborately discussed in *S. v. Kennedy,* 169 N. C., 326, and in *S. v. Crisp,* 170 N. C., 785.

These principles were all fully explained to the jury, and all others pertinent to the case on this appeal.  The doctrine of reasonable doubt was correctly stated and applied, and the jury could not have misunderstood the law in regard to it.

The prisoner has no reason to complain of the verdict.  He had threatened the deceased upon trivial grounds, saying that he would show him "that he was not the only bully around here," and he cursed him with the imprecation "God damn him, I will get him," and immediately left the mill, riding to his home in a wagon and procuring his pistol,

which he concealed, and returning to execute his threat "that he would get him," the deceased, which he so quickly did. This may not be true, and the prisoner's version may be the right one, but there was sufficient evidence for a finding that it was true. If so, the prisoner fought, not upon a principle of self-defense, but from malice preconceived, and with a definite intent to kill when he engaged in the fight, which, as the testimony shows, he did willingly, if not eagerly. He first secured to himself the safer side of the contemplated affray by arming himself beforehand with a deadly weapon, and then proceeded to the field of the conflict, where the second quarrel occurred, which he must have been seeking, and there did his deadly work. It is like *S. v. Hogue,* 51 N. C., 381, 384, where *Chief Justice Pearson* says for the Court: "The deceased committed a violent assault upon the prisoner as he entered the room. This was legal provocation, and if the case stopped there the killing would be manslaughter, and the character of the deceased as a quiet or violent man would be immaterial; but the case did not stop there for the jury, under instructions of which the prisoner has no right to complain, find that he killed 'of his malice forethought,' that he had formed the deadly purpose, prepared the weapon, and sought that particular time and place to do the deed. So the character of the deceased was immaterial. It is surely murder to kill with malice, express or aforethought, no matter how violent or wicked the deceased may be. His Honor laid down one proposition which we think too favorable to the prisoner, and it is referred to lest it may mislead. It assumes that the prisoner 'had prepared a deadly weapon with an intention to use it in case he got into a fight with the deceased, and went into the dining-room for the purpose of meeting with the deceased, and with the expectation of having a conflict with him,' and the killing is held to be manslaughter. Killing under these circumstances would be murder, because of the preconceived malice, although the deceased made the first assault," citing *S. v. Martin,* 24 N. C., 101.

It is true the deceased had a cant hook, which is a wooden lever with a movable iron hook near the end, used for canting or turning over logs, but according to *Hogue's case* this does not relieve the prisoner of all guilt or necessarily mitigate the guilt of murder. He fought with malice and a purpose to slay the deceased if he got the chance, and not in self-defense, so the jury found, and there was ample evidence of the fact.

There also was evidence—and, too, strong evidence—that his purpose to kill was preconceived, premeditatedly and deliberately formed, but the jury, as we have said, gave the prisoner the benefit of the doubt as to this feature of the case, and acquitted him of murder in the first degree, and convicted him only of slaying the deceased with malice.

We may add that we commend the charge of the court as to race

prejudice. It was proper, even though exception was not properly taken, that the jury should have been fully cautioned against the influence of all prejudice. There is but one law, as he stated, for all citizens, and our judges have always been careful to guard against any prejudice, if it exists, on account of racial antipathies. We do not believe such prejudice exists, and our records show that it does not. Our judges will be prompt, as they have been, to eradicate all such evil considerations from the jury box which are calculated to poison the fountain of truth and prevent even and exact justice to all men of whatever state, race or persuasion. We have striven to this end persistently, and will continue to do so whenever necessary. The presiding judge did not too strongly denounce a juror who would be swayed by any bad motive to do wrong by preventing justice and corrupting his verdict.

Our conclusion is that no error is disclosed by the record.

No error.